No. 98-064

293 Mont. 512

997 P. 2d 989

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 63

JOHN F. IWEN,

Plaintiff and Appellant,

v.

U.S. WEST DIRECT, A DIVISION OF U.S. WEST

MARKETING RESOURCES GROUP, INC., and

KIM HOLZER, its Agent, Servant, and Employee,

Defendants and Respondents.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Kenneth R. Neill, Judge presiding.


COUNSEL OF RECORD:


For Appellant:


Timothy J. McKittrick, McKittrick Law Firm, P.C.;

Great Falls, Montana


For Respondents:


Sarah M. Power; Gough, Shanahan, Johnson & Waterman;

Helena, Montana


Submitted on Briefs: August 27, 1999

No

Decided: April 1, 1999

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

**¶1. John Iwen brought this action against U.S. West Direct in the District Court for the Eighth Judicial District, Cascade County, to recover damages for a negligently constructed yellow page advertisement, infliction of emotional distress, and punitive damages. U.S. West Direct failed to answer Iwen's complaint and a default was entered. Prior to a hearing regarding a judgment on the default, U.S. West Direct moved to set aside the default. The District Court granted the motion and U.S. West Direct moved to stay litigation and compel arbitration. By an order dated January 21, 1998, the District Court granted U.S. West Direct's motion. Iwen appeals from that order. We reverse.**

**¶2. The issue presented on appeal is whether the District Court erred when it concluded that the arbitration provision in U.S. West Direct's directory advertising order is valid and enforceable and, therefore, whether Iwen is compelled to arbitrate his dispute with U.S. West Direct.**

FACTUAL BACKGROUND

**¶3. John Iwen is a licensed practicing attorney in Great Falls, Montana. On June 9, 1995, Iwen called U.S. West Direct to obtain an 800 telephone number and a new office telephone number to closely parallel the 800 number. These new telephone numbers were to be effective July 14, 1995. Iwen sent letters on July 10, 1995, in which he advised his clients, some attorneys, and judges of his new telephone numbers. He also ordered new business cards and stationary printed with the new telephone numbers.**

¶4. On July 5 or 6, 1995, Iwen met with Kim Holzer, a sales representative for U.S. West Direct, to arrange advertisement of his law practice and new telephone numbers in the U.S. West Direct yellow page directory. At that meeting, Iwen discussed with Holzer the size, content, and price of the yellow page advertisement. Holzer thereafter drafted a proof of the advertisement for Iwen to review.

¶5. In July 28, 1995, Iwen received a proof of the yellow page advertisement from Holzer which contained his new telephone numbers. Upon review of the proof, Iwen determined that he was not satisfied with the advertisement. On the same day, Iwen attempted to contact Holzer but found that she was unavailable. Iwen was then directed to a different sales representative whom he advised that he did not want the advertisement and instructed the sales representative to use the same advertisement he had used in the prior year's (1994-1995) U.S. West Direct yellow page directory, but to update it by adding his new office telephone numbers. Later that day, Iwen spoke to Holzer and gave her the same information he gave to the other sales representative. To assure that there was no mistake, Iwen wrote a letter dated July 28, 1995, which set forth the information he had conveyed verbally to Holzer and the other sales representative.

¶6. In early August 1995, Iwen received an unsolicited postcard dated August 4, 1995, from Kelly Frankenfeld, customer relations manager for U.S. West Direct, which requested Iwen's opinions regarding the service provided by Holzer. Iwen responded that Holzer's service and ideas for improving the advertisement were worse than expected. He also complained that Holzer's follow-up was poor and that he was rushed by Holzer.

¶7. As soon as the new U.S. West Direct yellow page directory was published and delivered to customers, Iwen noticed that his yellow page advertisement was incomplete because his 800 telephone number was missing. He also noticed that his residence address and home telephone number was deleted from the white pages. Iwen wrote a letter dated October 6, 1995, to Kelly Frankenfeld regarding these errors but received no response.

¶8. Iwen received a bill dated October 1, 1995, from U.S. West Communications, the billing agent for U.S. West Direct, which was to be paid by October 23, 1995. Upon receipt of that bill, Iwen wrote a letter dated October 16, 1995, to U.S. West Communications which advised that he was not going to pay that bill until an

agreement was reached with U.S. West Direct regarding the negligently constructed advertisement in the yellow pages and deletion of his white page telephone number and residence address.

¶9. In November 1996, Iwen received another bill from U.S. West for the months of October and November. In letters to U.S. West Communications and U.S. West Direct dated November 10, 1995, Iwen again advised that he was not going to pay the bill until an agreement was reached regarding his yellow page advertisement and the white page listing.

¶10. On November 30, 1995, Iwen received a disconnect notice from U.S. West Communications. Iwen immediately called U.S. West Communications and advised them of the dispute he had concerning the yellow page advertisement and white page listing. The person to whom Iwen spoke advised him that U.S. West Direct and U.S. West Communications are two separate entities. She advised Iwen to pay the sum of $545.11, the sum allegedly owed to U.S. West Communications. To prevent U.S. West Communications from disconnecting the phone service to his law firm, Iwen wrote a letter to U.S. West Communications on November 30, 1995, and enclosed a check in the amount of $545.11. Iwen sent a copy of that letter to Frankenfeld and Holzer. Iwen refused to pay the bill for the negligently constructed yellow page advertisement.

¶11. On January 3, 1996, Iwen spoke to Charlene Garberson, a customer service associate for U.S. West Direct, about the faulty yellow page advertisement and the white page deletion. Garberson wrote a letter to Iwen on January 3, 1996, which Iwen received several weeks later on January 24, 1996, concerning the conversation. Garberson acknowledged that the yellow page advertisement was faulty and apologized on behalf of U.S. West Direct. She also stated: "Unfortunately, you have informed us that you turned this matter over to your attorney. Therefore, at this time no adjustment will be applied and the account will bill in full."

¶12. On January 30, 1996, Iwen received another disconnect notice which stated that his phone service was going to be shut down for nonpayment of his bill to U.S. West Communications and U.S. West Direct. The disconnect notice advised Iwen that the total amount was due two days later, February 1, 1996. Once again, Iwen wrote letters to U.S. West Communications and U.S. West Direct, dated January 31, 1996, complaining of the treatment he received and enclosed a check in the amount of

$225.94 payable to U.S. West Communications. Iwen still refused to pay the U.S. West Direct bill for the faulty yellow page advertisement.

¶13. On February 20, 1996, Iwen's attorney received a letter from Garberson dated February 6, 1996, apologizing for the mistakes made and offering to settle the matter. The very next day, Iwen received a final collection notice from U.S. West Communications, the billing agent for U.S. West Direct. The notice demanded that Iwen pay for the erroneously constructed U.S. West Direct yellow page advertisement and threatened to deny Iwen credit for future advertising if he did not pay in full. The notice further threatened to demand a deposit for full payment for future advertising in advance, refer nonpayment information to major credit reporting agencies, refer Iwen to an outside collection agency, and not allow Iwen to advertise in the yellow pages at all if he did not make the payment in full.

¶14. On March 21, 1996, Iwen filed suit against U.S. West Direct for damages for negligent construction of the yellow page advertisement, infliction of emotional distress, and for punitive damages. On June 3, 1997, Iwen received a notice that U.S. West Direct's billing agent, U.S. West Communications, turned him over to the Credit Bureau of Missoula for collection of a debt in the amount of $1,779.38 for failing to pay for the yellow page advertisement.

¶15. U.S. West Direct moved to stay litigation and compel arbitration pursuant to the arbitration clause in the directory advertising order; the contract Iwen entered into with U.S. West Direct for the yellow page advertisement. Iwen resisted the motion by arguing that the arbitration provision in the directory advertising order was invalid. By order dated January 21, 1998, the District Court ruled that the arbitration provision is valid and granted U.S. West Direct's motion to stay litigation and compel arbitration.

## DISCUSSION

¶16. The issue presented on appeal is whether the District Court erred when it concluded that the arbitration provision in U.S. West Direct's directory advertising order is valid and enforceable and, therefore, whether Iwen is compelled to arbitrate his dispute with U.S. West Direct.

¶17. A district court's order compelling arbitration is subject to *de novo* review. *See*

*Zolezzi v. Dean Wittier Reynolds, Inc.* **(9th Cir. 1986), 789 F.2d 1447. As we stated in** *Ratchye v. Lucas*, **1998 MT 87, 288 Mont. 345, 957 P.2d 1128, we review a district court's conclusion of law regarding arbitrability to determine whether it is correct.**

**¶18. Without filing a motion to dismiss, U.S. West Direct has raised the issue of whether this Court has jurisdiction to hear this appeal. We have recently addressed the issue of the appealability of orders to arbitrate within the context of the Federal Arbitration Act and concluded that an order compelling arbitration is final and appealable.** *See Larsen v. Opie* **(1989), 237 Mont. 108, 110, 771 P.2d 977, 979.**

**¶19. The arbitration provision which is the focal point of this appeal is contained in U. S. West Direct's directory advertising order and states, in relevant part, as follows:**

11. ARBITRATION. Any controversy or claim arising out of or relating to this Agreement, or breach thereof, <u>other than an action by Publisher for the collection of the amounts due under this Agreement</u>, shall be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, which rules are incorporated herein by reference; provided, however, that any person nominated to act as arbitrator is licensed to practice law before the courts of the State where the arbitration is conducted. There shall be one arbitrator to any arbitration. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Venue for any arbitration under this provision shall be at the office of the American Arbitration Association closest to the Advertiser, or as such other location as the parties may agree.

(Emphasis added.)

**¶20. Iwen made several arguments in the District Court to support his contention that he should not be obligated to arbitrate this dispute. On appeal, however, he contends that the District Court erred when it enforced the arbitration provision because the provision itself is invalid. Iwen argued in the District Court, as he does here, that the agreement to arbitrate should not be upheld because it is a contract of adhesion which is oppressive, unconscionable, and against public policy. U.S. West Direct maintains that the arbitration clause was freely entered into by the parties and the provision is not a contract of adhesion nor is it in any way oppressive, unconscionable, or against public policy. Furthermore, U.S. West Direct contends**

that the District Court properly limited its review to the validity of the arbitration provision and once it determined that it was a valid arbitration agreement, it ordered the parties to arbitrate their dispute. *See* 9 U.S.C.A. 34 (1998).

¶21. In its ruling ordering the parties to arbitration, the District Court correctly referred to our decision in *Passage v. Prudential-Bache Securities, Inc.* (1986), 223 Mont. 60, 727 P.2d 1298, where we addressed the doctrine of adhesion and its applicability to contracts which contain arbitration clauses.

¶22. In applying these contract principles in the context of this case, the District Court determined that the arbitration provision was one of a number of terms located on the back of the order form and, therefore, was within the reasonable expectations of Iwen. The court then found that the arbitration provision provides for arbitration in conformity with the rules of the American Arbitration Association and, therefore, was not unduly oppressive, unconscionable, or against public policy.

¶23. This Court has, on previous occasions, decided the validity of various arbitration agreements. *See Casarotto v. Lombardi* (1994), 268 Mont. 369, 886 P.2d 931, *vacated by Doctor's Associates, Inc. v. Casarotto* (1995), 515 U.S. 1129, 115 S. Ct. 2552, 132 L. Ed. 2d 807; *Chor v. Piper Jaffray & Hopwood, Inc.* (1993), 261 Mont. 143, 862 P.2d 26; *Mueske v. Piper Jaffray & Hopwood, Inc.* (1993), 260 Mont. 207, 859 P.2d 444; *Larsen v. Opie* (1989), 237 Mont. 108, 771 P.2d 977; *Passage v. Prudential-Bache Securities, Inc.* (1986), 223 Mont. 60, 727 P.2d 1298. Because this contract evidences a transaction involving commerce, the application of the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16 (1998) is undisputed. Section 2 of the Act which pertains to the validity, irrevocability, and enforcement of agreements to arbitrate provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, <u>save upon such grounds as exist at law or in equity for the revocation of any contract.</u>

Title 9 U.S.C.A. § 2 (1998) (emphasis added). Therefore, in our review of the legal issue

presented, it is necessary that we refer to both federal and state law.

¶24. In *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University* (1989), 489 U.S. 468, 474, 109 S. Ct. 1248, 1253, 103 L. Ed. 2d 488, 497, the United States Supreme Court held that one of the fundamental tenets of the Federal Arbitration Act is that arbitration provisions should exist "upon the same footing" as all other contractual provisions. Evaluating arbitration agreements pursuant to federal law while evaluating all other contractual provisions pursuant to state law would place the arbitration provision on footing different from the rest of the contract; the arbitration provision would receive preferential treatment. *See Supak & Sons Mfg. Co. v. Pervel Indus., Inc.* (4th Cir. 1979), 593 F.2d 135, 137. We endorsed the notion of equal footing of arbitration provisions when we held that such provisions, like all other contractual provisions, are subject to the state's laws which govern unconscionability. *See Chor*, 261 Mont. at 148, 862 P.2d at 29; *see also* 9 U.S. C.A. § 2 (1998).

¶25. It is also important to note that contract law is typically the domain of the states. *See Aronson v. Quick Point Pencil Co.* (1979), 440 U.S. 257, 262, 99 S. Ct 1096, 1099, 59 L. Ed. 2d 296, 301. The existence of a federal common law of contract was rejected in *Erie R. Co. v. Tompkins* (1938), 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188, 1194. In fact, in *Perry v. Thomas* (1987), 482 U.S. 483, 492, 107 S. Ct. 2520, 2527, 96 L. Ed. 2d 426, 637, n.9, the Supreme Court indicated that state law should govern contract formation and revocation questions. In *Doctor's Associates, Inc. v. Casarotto* (1996), 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902, 908-09, the Court definitively stated that "the text of § 2 [of the Federal Arbitration Act] declares that state law may be applied" to determine questions of validity.

¶26. It is therefore clear that generally applicable contract law defenses may be used to set aside arbitration agreements. The United States Supreme Court has indicated, however, that states may not craft special rules which apply only to arbitration provisions for the purpose of defeating arbitration. In *Casarotto*, 517 U.S. at 687, 116 S. Ct. at 1656, 134 L. Ed. 2d at 909, the Supreme Court interpreted the Federal Arbitration Act as allowing state action generally applicable to all contract and other matters but not as fostering rejection or chilling of the federal policy in favor of arbitration. The Court noted that such an approach does not undermine the right to arbitrate which, by the very language of the Federal Arbitration Act, is intended to encompass only those arbitration agreements that are not tainted by fraud, duress,

or unconscionability. *See Casarotto*, 517 U.S. at 687, 116 S. Ct. at 1656, 134 L. Ed. 2d at 909.

¶27. With this background, we now address Montana case law which has considered the validity of arbitration clauses. As previously stated, the District Court correctly referred to our decision in *Passage* in determining the validity of the arbitration provision. In *Passage*, we explained the doctrine of adhesion and its applicability to contracts which contain arbitration clauses. We stated that for such contracts to be enforced against the weaker bargaining party, they must pass a two-prong test for validity. We stated that test as follows:

For such a contract or clause to be void, it must fall within judicially imposed limits of enforcement. It will not be enforced against the weaker party when it is: (1) not within the reasonable expectations of said party, or (2) within the reasonable expectations of the party, but, when considered in its context, is unduly oppressive, unconscionable or against public policy.

*Passage,* 223 Mont. at 66, 727 P.2d at 1302.

¶28. Accordingly, our application of the Montana law of contracts must initially begin with a determination of whether U.S. West Direct's directory advertising order, which contains the arbitration clause at issue, is a contract of adhesion. When determining whether a contract is one of adhesion, we focus on the nature of the contracting process, rather than the parties' relative sizes, resources, or bargaining power. Hence, we have held that contracts of adhesion "arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms." *Passage,* 223 Mont. at 66, 727 P.2d at 1301. Although the doctrine of adhesion itself does not constitute a sufficient basis for invalidating a contract, the adhesive nature of a contract, or contract provision, is generally noted to support other contract formation defenses such as unconscionability or public policy. *See Cohen v. Wedbush, Noble, Cooke, Inc.* (9th Cir. 1988), 841 F.2d 282, 286; *Passage*, 223 Mont. at 66, 727 P.2d at 1301-02.

¶29. Here, Iwen was faced with a standardized form agreement which U.S. West Direct used to market its yellow page advertising. The record clearly establishes that

**U.S. West Direct's directory advertising order is a standardized form agreement, the terms of which Iwen was unable to negotiate and for which his only choice was to accept or reject. As we held in *Transamerica Ins. Co. v. Royle* (1983), 202 Mont. 173, 181, 656 P.2d 820, 824, because this agreement is one of adhesion, we are justified in viewing this contract from the perspective of the consumer.**

**¶30. Once we have determined that this contract is a contract of adhesion, we apply the *Passage* test for validity. We must either determine whether the arbitration provision is not within Iwen's reasonable expectations, or within Iwen's reasonable expectations but, when considered in its context, is unduly oppressive, unconscionable, or against public policy. Because, as explained below, we conclude that the provision is unconscionable, we need not determine whether the provision violated Iwen's reasonable expectations.**

**¶31. In *Leibrand v. National Farmers Union Property & Casualty Co.* (1995), 272 Mont. 1, 898 P.2d 1220, we referred to a Third Circuit Court of Appeals decision and stated that:**

Unconscionability in a contract is a concept introduced under the Uniform Commercial Code and it has been applied to insurance contracts. Unconscionability requires a two-fold determination: that <u>the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions</u>.

*Leibrand*, *272 Mont. at 12-13, 898 P.2d at 1227 (quoting Worldwide Underwriters Ins. Co. v. Brady (3d Cir. 1992), 973 F.2d 192, 196) (citations omitted; emphasis added.) One need only look at the language of the arbitration provision itself to determine that it is unreasonably favorable to U.S. West Direct, the drafter. The language of the first sentence of the arbitration provision reads:*

Any controversy or claim arising out of or relating to this Agreement, or breach thereof, <u>other than an action by Publisher for the collection of the amounts due under this Agreement</u>, shall be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association . . . .

(Emphasis added.) Drafted as such, the weaker bargaining party has no choice but to settle all claims arising out of the contract through final and binding arbitration, whereas the more powerful bargaining party and drafter has the unilateral right to settle a dispute for collection of fees pursuant to the agreement in a court of law. As a practical matter, it is arguable that the primary reason U.S. West Direct would seek a remedy against Iwen, or any other advertiser for that matter, is if the advertiser refused to pay his or her advertising bill. Likewise, according to the terms of the contract, the only remedy an advertiser could seek from U.S. West Direct is a pro rata reduction or refund of the cost of the advertisement.[(1)] With the sole remedy for either party being the cost of the advertisement, it makes no sense for one party, U.S. West Direct, to have the freedom to seek the remedy before a court of law, while the other party, Iwen, is forced to seek the same remedy only through arbitration. U.S. West Direct pointedly protected itself by preserving its constitutional right of access to the judicial system while at the same time completely removed that right from the advertiser.

**¶32. Consistent with our decision in *Leibrand* and others which have defined contract unconscionability, this case presents a clear example of an arbitration provision that lacks mutuality of obligation, is one-sided, and contains terms that are unreasonably favorable to the drafter. Because U.S. West Direct presented this agreement on a take-it-or-leave-it basis, it is also a contract in which there was no meaningful choice on the part of the weaker bargaining party regarding acceptance of the provisions. Certainly, this does not mean arbitration agreements must contain mutual promises that give the parties identical rights and obligations, or that the parties must be bound in the exact same manner. This simply restates the rule of law that disparities in the rights of the contracting parties must not be so one-sided and unreasonably favorable to the drafter, as they are in this case, that the agreement becomes unconscionable and oppressive. *See Riccardi v. Modern Silver Linen Supply Co.* (N.Y. App. Div. 1974), 45 A.D.2d 191.**

**¶33. U.S. West Direct cites *Snap-on Tools Corp. v. Vetter* (D. Mont. 1993), 838 F. Supp. 468, for the proposition that the arbitration agreement in this case does provide for mutual obligations. However, we agree with the federal district court that although one party in *Snap-on Tools* was allowed to go to court to seek temporary relief pending arbitration, the parities' obligations were, for the most part, mutual because both parties were required to arbitrate. In this case, on the other hand, the parties' obligations are completely one-sided. U.S. West Direct is allowed access to the court system, while Iwen is not.**

¶34. Accordingly, our application of general principles that exist at law or in equity for the revocation of any contract leads us to conclude that the arbitration provision at issue in this case is unconscionable. Our application of Montana law regarding unconscionability does not undermine the right to arbitrate which is, by the very language of the Federal Arbitration Act, intended to encompass only those arbitration agreements that are not tainted by fraud, duress, or unconscionability.

¶35. We reverse the judgment of the District Court, strike the arbitration provision in U.S. West Direct's directory advertising order pursuant to § 30-2-302, MCA, and remand this case to the District Court for further proceedings consistent with this opinion.


/S/ JIM REGNIER



We Concur:


/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

1. [19]. REMEDY FOR ERROR OR OMISSION IN ADVERTISEMENT. IN THE EVENT OF ANY ERROR IN THE ADVERTISING AS PUBLISHED, THE ADVERTISER IS ENTITLED TO A PRO-RATA REDUCTION OR REFUND OF THE CHARGES FOR THE ADVERTISING IN THE SAME PROPORTION THAT THE ERROR REDUCES, IF AT ALL, THE VALUE OF THE ADVERTISEMENT AS A WHOLE. IN THE EVENT OF THE OMISSION OF ANY ITEM OF ADVERTISING, THE ADVERTISER IS ENTITLED TO A REFUND OF THE CHARGES PAID FOR THE ADVERTISING. ADVERTISER MUST NOTIFY PUBLISHER OF ANY ERROR OR OMISSION WITHIN SIX MONTHS OF PUBLICATION OF THE DIRECTORY IN WHICH THE

No

ERROR OR OMISSION OCCURS TO RECEIVE THE REDUCTION OR REFUND. Likewise, paragraph 10 specifically precludes an advertiser from seeking incidental damages, consequential damages, lost profits or any damages caused by the tortious conduct of U.S. West Direct. It states:

10. LIMITATION OF LIABILITY. THE REMEDY SET FORTH ABOVE FOR ANY ERROR OR OMISSION IN ADVERTISING IS ADVERTISER'S EXCLUSIVE REMEDY, AND PUBLISHER SHALL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS) WHETHER IN CONTRACT, TORT OR OTHERWISE.

Paragraphs 8 and 13 of the directory advertising order provide even further protection to U. S. West Direct by stating that U.S. West Direct is entitled to attorney fees and costs of legal action is taken by an advertiser.