# FILED

October 13 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 07-0489

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 329

LOU HAYES WOODRUFF,

       Plaintiff and Appellant,

   v.

BRETZ, INC., d/b/a BRETZ RV & MARINE,
a Montana corporation,

       Defendant and Appellee.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV- 2007-142
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Patrick G. Frank, Worden Thane, P.C., Missoula, Montana

       For Appellee:

       David B. Cotner, Datsopoulos, MacDonald & Lind, P.C.,
Missoula, Montana

            Submitted on Briefs:  June 18, 2008

                  Decided:  October 13, 2009

Filed:

          _____
                  Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Lou Hayes Woodruff appeals from the order of the Fourth Judicial District Court, Missoula County, dismissing her complaint and ordering the parties to submit the matter to binding arbitration. We reverse and remand for further proceedings.

## BACKGROUND

¶2 On March 23, 2006, Woodruff purchased a 2002 Alfa motor home from Bretz, Inc., dba Bretz RV & Marine, for $134,995.00. After the purchase, and when the weather warmed up, the motor home began to smell. Woodruff hired a restoration and janitorial service, which inspected the motor home and found pet urine "in great quantities throughout the entire carpet in coach," as well as "[u]rine wicking . . . in some walls." These areas were determined to be "non-salvageable due to extreme amounts of urine," and Woodruff ultimately spent over $17,000 for repairs to the motor home in order to mitigate the urine contamination. Notably, the inspection company told Woodruff that Bretz had contacted them in January 2006 with questions of how best to clean carpeting that had been contaminated with animal urine. Woodruff, however, was not informed prior to purchasing the motor home of its contaminated condition.

¶3 Woodruff commenced the instant action against Bretz in January 2007, seeking damages for breach of contract, misrepresentation, negligence, negligent misrepresentation, constructive fraud, breach of implied warranties, breach of express warranties, breach of the obligation of good faith and fair dealing, and violation of the Consumer Protection Act. Bretz responded with a motion to compel arbitration based on an arbitration clause contained in the purchase contract. This contract is a standard-form

2

contract[1] provided by Bretz. The arbitration clause is contained on page 2 along with various other terms and conditions. It states:

> **11. CONTROLLING LAW.** The law of the State of Montana is the law which is to be used in interpreting the terms of the contract. You and I agree that all claims, disputes and questions regarding the rights and obligations of You and I under the terms of this agreement, shall be settled by arbitration, in accordance with the rules, then applicable, of the American Arbitration Association, and judgment on the award rendered may be entered in any court having jurisdiction. You and I further agree that Missoula County, Montana, shall be the venue for this arbitration and that the costs and charges of arbitration shall be split equally by You and I.

¶4 The District Court held a hearing and thereafter granted Bretz's motion. The court reasoned that the relief Woodruff sought in her complaint could be obtained through arbitration, with the exception of her demand for a jury trial which the court stated Woodruff "has failed to show that she has a right to have when there is an otherwise enforceable arbitration clause in the contract." The court characterized Woodruff as "the weaker party" in the negotiations; however, the court decided that her failure to read the arbitration clause before signing the purchase contract (1) did not constitute "oppression, unconscionability, or violation of public policy which would render the arbitration provision voidable as a contract provision of adhesion" and (2) did not render the provision "unenforceable for not being within [her] reasonable expectation." The court consequently ordered the parties to submit the matter to arbitration. Woodruff now appeals.

---

[1] A "standard-form contract" is "[a] usu. preprinted contract containing set clauses, used repeatedly by a business or within a particular industry with only slight additions or modifications to meet the specific situation." *Black's Law Dictionary* 348 (Bryan A. Garner ed., 8th ed., West 2004).

3

## ISSUE AND STANDARD OF REVIEW

¶5 The sole issue on appeal is whether the District Court erred in granting Bretz's motion to compel arbitration. This Court reviews a district court's order granting a motion to compel arbitration de novo. *Martz v. Beneficial Montana, Inc.*, 2006 MT 94, ¶ 10, 332 Mont. 93, 135 P.3d 790.

## DISCUSSION

¶6 At the outset, Woodruff notes that the District Court misapprehended her arguments in opposition to Bretz's motion to compel arbitration. She explains that she is not contending that the arbitration clause is unenforceable because she did not read it before signing the purchase contract. Rather, her position is that the arbitration clause is unenforceable because it is unconscionable, because it was not within her reasonable expectations as a consumer, and because she did not knowingly waive her constitutional rights to a jury trial and to access the court system. Indeed, those are the exact arguments in Woodruff's brief opposing Bretz's motion.

¶7 Arbitration is a matter of contract, and a party cannot be required to submit to arbitration a dispute which she has not agreed so to submit. *Solle v. Western States Ins. Agency*, 2000 MT 96, ¶ 22, 299 Mont. 237, 999 P.2d 328. Thus, when a district court is asked to compel arbitration of a dispute, the threshold inquiry is whether the parties agreed to arbitrate that dispute. *Solle*, ¶ 22; *State ex rel. Bullock v. Philip Morris, Inc.*, 2009 MT 261, ¶ 15, 352 Mont. 30, ___ P.3d ___; § 27-5-115, MCA. Ordinary state-law rules of contract formation and interpretation apply to arbitration agreements, and generally applicable contract-law defenses may be used to set aside such agreements. *See*

4

*Solle*, ¶ 23; *Philip Morris*, ¶ 15; *Iwen v. U.S. West Direct*, 1999 MT 63, ¶ 26, 293 Mont. 512, 977 P.2d 989; § 27-5-114(2), MCA.

¶8      In light of the theories argued by Woodruff, our application of the Montana law of contracts begins with a determination of whether the purchase contract which contains the arbitration clause at issue is a contract of adhesion. *See Iwen*, ¶ 28. An adhesion contract is "[a] standard-form contract prepared by one party, to be signed by the party in a weaker position, usu. a consumer, who adheres to the contract with little choice about the terms." *Black's Law Dictionary* at 342; *see also Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 24, 310 Mont. 123, 54 P.3d 1 ("A contract of adhesion is a contract whose terms are dictated by one contracting party to another who has no voice in its formulation." (citing Arthur L. Corbin, *Corbin on Contracts* vol. 1, § 1.4, 13 (Joseph M. Perillo ed., rev. ed., West 1993))). Although one who executes a written contract is generally "presumed to know the contents of the contract and to assent to those specified terms," *Quinn v. Briggs*, 172 Mont. 468, 476, 565 P.2d 297, 301 (1977), the law pertaining to contracts of adhesion "recognizes that in certain circumstances, traditional assumptions associated with contract law are unfounded," *Kloss*, ¶ 24. Contracts do not always reflect terms that were bargained for at arms length; instead, terms are sometimes dictated by one party to another who has no bargaining power and no realistic options. *Kloss*, ¶ 24. Thus, we have recognized that contracts of adhesion arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party whose choice is either to accept or to reject the contract without the opportunity to negotiate its terms. *Kloss*, ¶ 24.

¶9 Here, we agree with Woodruff that Bretz's purchase contract easily falls within this definition. The contract is a standardized form of agreement drafted by Bretz which, as the District Court implicitly found, had superior bargaining power.[2] Moreover, the contract was presented to Woodruff whose choice was either to accept or to reject it without the opportunity to negotiate the preprinted terms. The contract thus qualifies as one of adhesion. *Cf. Larsen v. Western States Ins. Agency*, 2007 MT 270, ¶ 14, 339 Mont. 407, 170 P.3d 956.

¶10 Bretz relies heavily on *Denton v. First Interstate Bank of Commerce*, 2006 MT 193, 333 Mont. 169, 142 P.3d 797, in arguing that the purchase contract is not a contract of adhesion. *Denton*, however, is readily distinguishable from the present case in ways that favor Woodruff. Denton was a "sophisticated business person" who, as a "valued FIB client," was in a strong bargaining position. *See Denton*, ¶ 33. By contrast, Woodruff was the weaker party to the transaction with Bretz and had a "relative lack of sophistication" regarding arbitration clauses and their consequences. *Cf. Kloss*, ¶ 37. Denton knew the contents of his contract, having "studied" it prior to signing it. *See Denton*, ¶ 34. By contrast, Woodruff is an ordinary citizen who was unfamiliar with and did not have an understanding of the arbitration process referred to in the contract.

¶11 Bretz contends that the purchase contract cannot be deemed an adhesion contract without evidence that Woodruff asked Bretz to delete the arbitration clause but Bretz refused to do so. Bretz, however, cites no authority for such an evidentiary requirement. Bretz, moreover, misapprehends the distinctive feature of a contract of adhesion, which is

---

[2] The court observed that Woodruff was "the weaker party" to the transaction.

6

that the weaker party has " 'no realistic choice as to its terms.' " *Broemmer v. Abortion Services of Phoenix*, 840 P.2d 1013, 1016 (Ariz. 1992) (quoting *Wheeler v. St. Joseph Hospital*, 133 Cal. Rptr. 775, 783 (Cal. App. 4th Dist. 1976)).

> For example, a would-be borrower from a bank or other financing institution applies for a loan. Once the application is approved, the bank clerk inserts a limited amount of information and terms (name, address, amount, interest rates, etc.) into the blanks of pre-printed forms prepared by the bank, many clauses of which will be identical or similar to those in use by competitive lenders. The borrower may be asked to check the information and terms that have been inserted manually, but an attempt to read the pre-printed provisions of the documents will likely be met with impatience. Indeed, reading the rest of the provisions of the documents might be rather pointless because the borrower has only the choice between taking the offered terms or leaving them. The process of entering into a contract of adhesion ". . . is not one of haggle or cooperative process but rather of a fly and flypaper."

Corbin, *Corbin on Contracts* § 1.4, 13-14 (ellipsis in *Corbin*). It follows from Corbin's observations that the truly negotiable terms of such contracts are those to be inserted into the blanks, such as the amount being borrowed, the interest rate, and the like. Woodruff, for example, might have haggled over price, but not over the preprinted terms listed on page 2 of Bretz's standard-form purchase contract. In this regard, although Woodruff filed an affidavit stating that the purchase contract "was provided by Bretz without any ability on my part to negotiate the printed terms or provisions," Bretz offers nothing but self-serving, after-the-fact innuendos in its appellate brief to the effect that those terms were actually negotiable, had Woodruff only asked.

¶12    Citing ¶ 24 of *Kloss*, Bretz also argues that in order for a contract to be considered one of adhesion, "the party must be faced with an industry-wide practice of arbitration agreements and the possibility of being excluded from the industry as a whole unless the

party accepts the agreement to arbitrate." *Kloss*, however, imposes no such requirement. It is true, as we recognized in *Kloss*, that the take-it-or-leave-it nature of adhesion contracts is "particularly onerous" when the weaker party is presented with an industry-wide practice and there are no alternatives but to enter into the contract. *See* William L. Corbett, *Arbitrating Employment Law Disputes*, 68 Mont. L. Rev. 415, 436 (2007); *Kloss*, ¶¶ 24, 27. Our observations in *Kloss* concerning industry-wide practices were due to the fact that *Kloss* itself involved an adhesion contract containing language that was universally prescribed for brokerage contracts. *See Kloss*, ¶¶ 18, 24, 27. However, we did not in *Kloss*—nor do we here—hold that an industry-wide practice is an indispensible element of an adhesion contract.

¶13 Because Bretz's standard-form purchase contract is one of adhesion, we view the contract from the perspective of the consumer, i.e., Woodruff. *Iwen*, ¶ 29. But the fact that the purchase contract is one of adhesion does not by itself render the arbitration clause unenforceable. *See Iwen*, ¶ 28; *Kloss*, ¶ 24; *Denton*, ¶ 33. Rather, a contract of adhesion will not be enforced against the weaker party when it (1) is not within the reasonable expectations of said party or (2) is within the reasonable expectations of said party but, when considered in its context, is unduly oppressive, unconscionable, or against public policy. *Iwen*, ¶ 27; *Kloss*, ¶ 23. Although Woodruff argues both of these prongs, the first is sufficient to resolve this appeal. *Cf. Iwen*, ¶ 30.

¶14 In agreeing to arbitrate, a party agrees to forgo a judicial forum. Arbitration clauses by their very nature, therefore, implicate a consumer's fundamental constitutional rights of access to the courts, trial by jury, due process of law, and equal protection of the

8

laws, as well as various procedural rights such as the rights to court-ordered discovery, to have the admissibility of evidence determined under the Montana Rules of Evidence, to receive findings of fact and legal analysis based on the evidence, and to enforce the applicable law by way of appeal. *See Kloss*, ¶ 28; *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 26, 349 Mont. 475, 204 P.3d 693; *see also e.g. Mueske v. Piper, Jaffray & Hopwood, Inc.*, 260 Mont. 207, 209-10, 859 P.2d 444, 446 (1993).

¶15    The fact that an arbitration clause is contained in the contract does not by itself establish the weaker party's reasonable expectations. *Larsen*, ¶ 16. To hold otherwise would defeat the protections provided by principles of law pertaining to contracts of adhesion. *Kloss*, ¶ 29. Indeed, if the only question was whether the written terms of the contract included the challenged provision, then reasonable expectations would never be an issue and contracts of adhesion would always be enforced based on their plain language without regard to what the consumer knew or understood. *Kloss*, ¶ 29. Instead, reasonable expectations derive from all of the circumstances surrounding the execution of the contract, such as the consumer's business experience and sophistication, any routine practice between the parties established through prior dealings, whether the consumer studied the agreement and comprehended its terms, whether the consumer had the advice or representation of counsel, and whether the challenged provision and the consequences of the provision were fully and adequately explained to the consumer. *See e.g. Kloss*, ¶ 28; *Denton*, ¶ 34; *Larsen*, ¶ 17. In addition, the waiver of fundamental constitutional rights must be voluntary, knowing, and intelligent—an issue that likewise depends on the totality of the circumstances. *See Kortum-Managhan*, ¶¶ 26-27.

¶16 Here, Woodruff states in her affidavit that no one from Bretz explained to her the preprinted provisions contained in the purchase contract, and in particular "there was no discussion of or explanation of the arbitration provision." Woodruff further attests that when she bought the motor home, "I did not understand or expect that I was waiving legal rights that I had such as my right to a jury trial or any access to the Montana court system," "I did not understand the arbitration process or understand that I would not have the ability to conduct discovery or that I would lose my right to appeal a ruling even if the ruling failed to correctly apply the law or incorrectly found the facts," "I did not know that Bretz' contract form contained waiver language of remedies that I would otherwise have under Montana law such as consumer protection, fraud, and deceit," and "I did not know that Bretz' contract form contained language that limits the damages I could recover from Bretz because of its conduct." Woodruff notes that she was not represented by counsel during the negotiation for or purchase of the motor home. And, as noted above, she was the weaker party to the transaction with Bretz and had a relative lack of sophistication regarding arbitration agreements and their consequences.

¶17 Woodruff's evidence is uncontested. Indeed, Bretz has come forward with no affidavits or other evidence to refute any of Woodruff's statements. Moreover, those statements are confirmed by the language of the purchase contract itself, which says nothing about any rights being waived. The arbitration clause simply states:

> **11.    CONTROLLING LAW.** The law of the State of Montana is the law which is to be used in interpreting the terms of the contract. You and I agree that all claims, disputes and questions regarding the rights and obligations of You and I under the terms of this agreement, shall be settled by arbitration, in accordance with the rules, then applicable, of the

10

American Arbitration Association, and judgment on the award rendered may be entered in any court having jurisdiction. You and I further agree that Missoula County, Montana, shall be the venue for this arbitration and that the costs and charges of arbitration shall be split equally by You and I.

This provision, by which Woodruff waived various constitutional and procedural rights, was clearly not within her reasonable expectations. *Cf. Kloss*, ¶ 28.

¶18 Bretz repeatedly cites a document Woodruff signed on or about February 27, 2006 (24 days before she signed the purchase contract). Bretz refers to this document as a "Memorandum of Understanding." It is a two-page standard-form document prepared by Bretz and containing 12 "understandings"—e.g., "I understand that no verbal promises can be honored" and "I understand that I must furnish my own insurance to protect this vehicle." Bretz directs our attention to the fifth "understanding," which states: "I understand the agreement that I will be signing requires binding arbitration rather than the use of the traditional legal system." Woodruff initialed next to this and the other applicable "understandings" in the Memorandum, and Bretz contends that she thereby "manifested her assent that she understood that the [purchase contract] required 'binding arbitration rather than the use of the traditional legal system.' "

¶19 To the extent Bretz seeks to bolster the language of the purchase contract by incorporating the foregoing language from the earlier Memorandum of Understanding, Bretz's argument fails. The purchase contract contains an integration clause[3] which states, in pertinent part, that "[t]his agreement contains the entire understanding between

---

[3] An "integration" or "merger" clause is "[a] contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." *Black's Law Dictionary* at 824.

you and me." Therefore, any understandings contained in the February 27, 2006 Memorandum of Understanding but not contained in the March 23, 2006 purchase contract are not part of the parties' contract. Section 28-2-905(1), MCA.

¶20 That said, to the extent the Memorandum of Understanding is considered for the limited purpose of determining Woodruff's reasonable expectations, we conclude that it provides no support for Bretz's position. For one thing, the uncontested evidence reflects that Woodruff "was told where to initial this form without discussion of or explanation of any of the contents of the form. It was presented to [her] simply as one of the sales documents that was necessary to sign and initial to complete the sale." Moreover, the fifth "understanding" does not advise Woodruff of the constitutional and procedural rights she effectively will be waiving. Although it states that the agreement she will be signing "requires binding arbitration rather than the use of the traditional legal system," we reject Bretz's contention that referring to "the traditional legal system" constitutes "clear and adequate notice" of all the rights being waived. Thus, even in light of the parties' earlier Memorandum of Understanding, the arbitration clause of the purchase contract by which Woodruff waived various constitutional and procedural rights was not within Woodruff's reasonable expectations.

¶21 The Dissent argues that Bretz's standard-form purchase contract is not a contract of adhesion and that the arbitration clause was within Woodruff's reasonable expectations. These arguments founder on both the law and the facts. First, as to the adhesion issue, the question is not whether the party who prepared the standard-form contract simply provided the other party with advance notice of the key terms to which

12

she ultimately would be bound. Dissent, ¶ 28. A contract of adhesion is a contract whose terms are dictated by one contracting party to another, *Kloss*, ¶ 24, and the fact that three weeks prior to signing the contract the other party is given a memorandum summarizing what its terms will be does not dispel the adhesive nature of the contract. The relevant question, rather, is whether the other party had bargaining power, realistic options, a meaningful opportunity to negotiate the terms of the contract, and a voice in the formulation of the contract's terms. *Kloss*, ¶ 24; *Denton*, ¶ 32. Here, the record establishes—and the Dissent does not dispute—that Bretz and Woodruff were not on equal footing. This was a consumer contract, and Woodruff indisputably was, as the District Court observed, "the weaker party" to the transaction. Furthermore, the Dissent completely misstates the record when it asserts that Bretz took steps "to communicate the terms of the purchase to Woodruff *before the contract was prepared* and to allow for her input." Dissent, ¶ 28 (emphasis added). The terms at issue here were *preprinted* as part of Bretz's *standard-form* contract, and Woodruff's evidence that these terms were presented on a take-it-or-leave-it basis is unrefuted. The notion that Bretz was "amenable to negotiating" the preprinted terms of its standard-form contract (Dissent, ¶ 31) is sheer conjecture on the part of the Dissent. Likewise, the Dissent's suggestion that Bretz "invited" Woodruff to give her "input" to a reformulation of those terms (Dissent, ¶ 28) is without any factual basis in the record. Indeed, there is no evidence anywhere in the record for the Dissent's rather implausible proposition that Bretz reformulated the *preprinted* terms of its *standard-form* contract for each individual sale. The Dissent points to Bretz's Memorandum of Understanding; yet, rather than inviting Woodruff to

negotiate the terms of the purchase contract, the Memorandum in reality required her to acknowledge and accept what those terms ultimately would be. For example, the fifth "understanding" states: "I understand the agreement that I will be signing requires binding arbitration rather than the use of the traditional legal system." The Dissent contends that Bretz "encouraged" Woodruff to ask questions.[4] Dissent, ¶ 28. Yet, contrary to the Dissent's interpretation, an offer to answer questions about the sale is not the same as an invitation to haggle over preprinted contract terms that Bretz has already included in its standard-form agreement. The Memorandum itself is a standard-form document; and, as noted, it was presented to Woodruff "as one of the sales documents that was necessary to sign and initial to complete the sale," not as an invitation to reformulate preprinted standard-form contract terms. Bottom line, there is no evidence that Bretz afforded Woodruff a meaningful opportunity to negotiate the terms of the purchase contract or a voice in the formulation of those terms.

¶22 As for the Dissent's brief argument regarding Woodruff's reasonable expectations, we cannot agree that her initials next to the fifth "understanding" establish that the arbitration clause was within her reasonable expectations. Dissent, ¶ 32. Again,

> [i]f the only question was whether the written terms of a contract included the challenged provision, reasonable expectations would never become an issue. Contracts of adhesion would always be enforced based on their plain language without regard to what the consumer knew or understood. However, that is not the law pertaining to contracts of adhesion as previously set forth in our prior decisions which apply to any contract.

---

[4] After listing the 12 "understandings," the Memorandum concludes as follows: "Please do not accept delivery of this vehicle unless all phases of the sale are made completely clear to you. Please do not hesitate to ask if you have any questions."

14

*Kloss*, ¶ 29.  Furthermore, while it may be argued that giving "advance notice and caution . . . of the important items to which she would be bound" shapes a consumer's reasonable expectations, Dissent, ¶ 32, the fact is that in the present case, Bretz's "notice" was wholly insufficient to advise Woodruff of the constitutional and procedural rights she effectively would be waiving.  Woodruff has shown that the arbitration clause was not within her reasonable expectations.  *See* ¶¶ 16-17, *supra*.  Her evidence is unrefuted.

¶23    In conclusion, the record reflects that Bretz contacted a restoration and janitorial service in January 2006 with questions of how best to clean carpeting contaminated with animal urine.  Two months later, Bretz sold Woodruff a motor home that was heavily contaminated with animal urine such that parts of the motor home were non-salvageable.  Woodruff then had to spend some $17,000 to refurbish the motor home before she could use it.  We are not even remotely persuaded that an ordinary consumer in Woodruff's position and with her relative level of sophistication regarding arbitration clauses would reasonably expect that she is giving up her valuable right to present such facts to a jury and seek reasonable damages in the courts of this state.  Indeed, Woodruff would not have agreed to forgo her right to bring this action had Bretz's salesperson told her before she signed the purchase contract:  "By the way, the motor home you are purchasing may be heavily contaminated with animal urine, and when the weather warms up it will smell so bad that you will not be able to use it.  But if you spend $15,000 to $20,000, you can probably fix it up."  Rather, Woodruff most likely would have moved on to another dealer.  Consumers do not reasonably expect to be treated as Woodruff was here.  More

to the point, they do not reasonably expect to give up their right to go to court when they are treated as Woodruff was here.

**CONCLUSION**

¶24    Bretz's standard-form purchase contract is one of adhesion, and the arbitration clause contained therein was not within Woodruff's reasonable expectations. The provision is, therefore, unenforceable. We accordingly reverse the District Court's order dismissing Woodruff's complaint and ordering the parties to submit the matter to binding arbitration, and we remand this matter to the District Court for further proceedings consistent with this Opinion.

¶25    Reversed and remanded.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS

Justice Jim Rice, dissenting.

¶26    It is apparent to me upon reading ¶ 23 of the Opinion that the Court has allowed the alleged circumstances of the underlying liability claim to influence its analysis of the

16

arbitration issue. While it may well be an incorrigible act to sell a motor home contaminated with animal urine, that alleged act is not the issue before the Court. No matter how egregious the alleged act by Bretz may be, our focus in this appeal should be solely upon whether the parties agreed to arbitrate the claims. Because I believe Bretz and Woodruff properly agreed to arbitrate this claim, I would affirm.

¶27 First, the contract between Bretz and Woodruff should not be considered a contract of adhesion. The primary factor distinguishing a contract of adhesion from other contracts is the lack of power the non-drafting party, typically the weaker party, has to change the terms. *Zigrang v. U.S. Bancorp Piper Jaffray, Inc.*, 2005 MT 282, ¶ 14, 329 Mont. 239, 123 P.3d 237 ("Contracts of adhesion arise when a party possessing superior bargaining power presents a standardized form of agreement to a party whose choice remains either to accept or reject the contract without the opportunity to negotiate its terms." (quoting *Kloss*, ¶ 24)). In determining whether a party lacks bargaining power, this Court has considered whether: the superior party prepared the standardized investment agreement; the weaker party had an opportunity to negotiate; and the superior party explained the consequences of the arbitration clause to the weaker party. *Larsen v. Western States Ins. Agency, Inc.*, 2007 MT 270, ¶ 14, 339 Mont. 407, 170 P.3d 956 (citing *Kloss*, ¶¶ 27-28). The capstone of an adhesion contract is the weaker party's lack of voice. *Denton v. First Interstate Bank of Com.*, 2006 MT 193, ¶ 30, 333 Mont. 169, 142 P.3d 797.

¶28 Here, Bretz clearly provided Woodruff with a "meaningful opportunity to negotiate the terms of the contract." *Denton*, ¶ 32; *see Kloss*, ¶ 24. *One month prior* to

17

the signing of the purchase agreement, Bretz provided Woodruff with a Memorandum of Understanding summarizing the key terms which would be included in their future contract. Notably, similar to the final contract, the Memorandum is short and easily understood. It is just two pages long and presents the information in normal font—no fine print. The first paragraph of the Memorandum clearly states, in all capital letters, that the purpose of the Memorandum was to avoid any misunderstandings regarding the terms of Woodruff's prospective purchase. Although the Court concludes the contract was presented to Woodruff on a take it or leave it basis without providing an opportunity to negotiate the terms, this conclusion fails to consider the steps Bretz took to communicate the terms of the purchase to Woodruff before the contract was prepared and to allow for her input. Woodruff has not alleged that she attempted, or even thought, to negotiate any terms, yet the Court uses her lack of initiative to reason that Bretz's actions constituted hard-line salesmanship. To the contrary, Bretz's process *invited* inquiries from Woodruff, which she did not make. The Court responds that this statement "is without any factual basis in the record," Opinion, ¶ 21, but that is simply not true. The Memorandum's statement to Woodruff a month prior to the closing—"Please do not hesitate to ask if you have any questions"—encouraged Woodruff to do just that. Although the Court denies it, this evidence is clearly in the record. The Court further puts its selective spin on the record by holding that the Memorandum "*in reality* required [Woodruff] to acknowledge and accept what those terms ultimately would be." Opinion, ¶ 21 (emphasis added). Here, in order to reach its conclusion, the Court resorts to concluding that the Memorandum did something other than what it actually said.

18

¶29     The Court then excuses Woodruff for not reading the contract documents, thus ignoring the long-held principle that one is presumed to know the contents of the contracts to which they agree—even the contents of adhesion contracts.  In a recent arbitration case, we described the duty to read one's contract as "a basic tenet of contract law." *Denton*, ¶ 34.  The Court holds today that the weaker party in an adhesion contract may escape her obligations under a contract merely by claiming, "I didn't read it." Woodruff should not be able to throw up her hands and hide behind her self-induced ignorance.

¶30     The Court then considers Woodruff's ability to understand the terms as if she had read the document, reasoning from this approach that Woodruff "did not have an understanding of the arbitration process referred to in the contract."  Opinion, ¶ 10.  The Court fails to give weight to the steps Bretz took in the month prior to Woodruff's commitment to the contract to ensure Woodruff understood the terms and had an opportunity to inquire about any terms she did not understand.  In bold print above the signature line of the Memorandum, Bretz cautioned Woodruff, "Please do not accept delivery of this vehicle unless all phases of the sale are made completely clear to you. Please do not hesitate to ask if you have any questions."  This effort by Bretz to work with the consumer should be commended, but instead it is criticized.

¶31     The Court then speculates, in contradiction to the evidence, that Bretz would not have been amenable to negotiating any terms other than price, and scolds Bretz for offering a "self-serving" suggestion that Woodruff should have asked about the terms before creating the façade that she was committing herself to them.  Self-serving as it

19

may be, Bretz's argument is nonetheless correct—Bretz's approach provided a convenient opportunity to ask questions which Woodruff could have availed herself of.[1] The Court creates support for its rejection of Bretz's consumer-helpful approach by invoking a new rule, without authority and within the same paragraph as it criticizes Bretz for citing no authority, that contract terms are per se non-negotiable if they appear on a pre-printed form. Opinion, ¶ 11 ("truly negotiable terms of such contracts are those to be inserted into the blanks").

¶32 Although I primarily disagree with the Court's initial determination that the contract was one of adhesion, I also disagree with its second conclusion that the arbitration clause was not reasonably within Woodruff's expectations. While the Court rejects Bretz's argument that the Memorandum establishes Woodruff was made aware of the arbitration provision, I cannot ignore the effect of this evidence: Woodruff clearly received advance written notice of the terms and had a month-long opportunity to discuss the terms prior to entering the contract. Thus, even under the Court's new rule that the only "negotiable terms" are those which are inserted into blanks, the Court should give great weight to the blank Woodruff personally filled with her initials—acknowledging that "I understand the agreement that I will be signing requires binding arbitration." The fact that the final contract contained an integration clause does not eliminate the advance notice and caution Bretz gave Woodruff of the important items to which she would be bound, and her written expression of receipt of that notice. As the Court sees it, Bretz's extra effort to advise the consumer of the terms counts for nothing.

---

[1] Woodruff's arguments could likewise be classified as "self-serving."

¶33　I dissent.

/S/ JIM RICE

Justice John Warner joins the dissent of Justice Jim Rice.

/S/ JOHN WARNER