DA 12-0313

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 62

TIFFANY KELKER,

        Plaintiff and Appellee,

   v.

GENEVA-ROTH VENTURES, INC., d/b/a
LOAN POINT USA, and MARK CURRY,

        Defendants and Appellants

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 11-1355
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Peter F. Habein, Monique P. Stafford, Crowley Fleck PLLP,
Billings, Montana

        For Appellee:

            John Heenan, Bishop & Heenan, Billings, Montana

                  Submitted on Briefs:  November 21, 2012

                          Decided:  March 12, 2013

Filed:

           _____
                        Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1  Tiffany Kelker (Kelker) submitted an online application for a payday loan with Geneva-Roth Ventures, Inc. (Geneva-Roth). Geneva-Roth charged Kelker an interest rate of 780% APR. The Loan Agreement, which Kelker signed electronically, contained an arbitration clause. Kelker brought a putative class action against Geneva-Roth for charging an interest rate higher than the 36% APR permitted by the Montana Consumer Loan Act for payday loans, § 32-5-301, MCA. Geneva-Roth filed a motion to compel arbitration pursuant to the arbitration clause in the Loan Agreement. The District Court deemed the arbitration clause unenforceable and denied Geneva-Roth's motion. Geneva-Roth appeals.

¶2  Geneva-Roth raises the following issue on appeal:

¶3  *Whether the District Court should have compelled arbitration pursuant to the arbitration clause in the loan agreement.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶4  Kelker, a Montana resident, submitted an online application at Geneva-Roth's website, www.loanpointusa.com, for a $600 "payday loan" on January 14, 2011. Geneva-Roth, a non-resident of Montana, charged Kelker an interest rate of 780% APR. Geneva-Roth ultimately withdrew electronically over $1,800 in interest charges from Kelker's bank account.

¶5  To complete her loan application, Kelker clicked on a box that stated that she had read, understood, and agreed to be bound by the terms of the Loan Agreement, and that she understood that by typing in her name in a separate box, she was electronically

2

signing her loan application. The full text of the eight-page Loan Agreement was not visible on Kelker's computer screen unless she scrolled down. The Loan Agreement included a clause to compel arbitration for "any claim, dispute, or controversy" that arose out of the agreement. Geneva-Roth used bold font and all capital letters to draw attention to certain provisions of the Loan Agreement. Geneva-Roth did not highlight the arbitration clause in this manner.

¶6 The disputes purportedly governed by the arbitration clause include "the validity of this agreement to arbitrate disputes." Geneva-Roth agreed to waive the "[c]ustomer's arbitration fees" in the event that the customer could not afford to pay them. The arbitration clause provides no guidance, however, as to the standard to employ to make this determination or who would be empowered to make this determination. The clause further provides that any arbitration hearing would "take place at a location near Customer's residence." The clause provides no guidance as to what constitutes "near."

¶7 Kelker brought a putative class action in which she alleges that the 780% interest rate charged by Geneva-Roth violated the Montana Consumer Loan Act, § 32-5-301, MCA. Kelker also claimed that the loan itself was unconscionable, that Geneva-Roth had engaged in unfair, deceptive, or fraudulent practices in making and collecting on the loan, that Geneva-Roth had failed to provide the disclosures required under the Montana Consumer Loan Act, and that Geneva-Roth had engaged in business in Montana without a valid license.

¶8    Geneva-Roth sought to compel arbitration pursuant to the arbitration clause in the Loan Agreement.  The District Court deemed the arbitration clause unenforceable and denied Geneva-Roth's motion to compel arbitration.  Geneva-Roth appeals.  We affirm.

## STANDARD OF REVIEW

¶9    We review de novo a district court's order to compel arbitration.  *Mardsen v. Blue Cross & Blue Shield of Mont., Inc.*, 2012 MT 306, ¶ 8, 368 Mont. 34, 291 P.3d 1229; *Solle v. Western States Ins. Agency*, 2000 MT 96, ¶ 8, 299 Mont. 237, 999 P.2d 328.

## DISCUSSION

¶10    *Whether the District Court should have compelled arbitration pursuant to the arbitration clause in the Loan Agreement.*

¶11    Agreements to arbitrate generally represent valid and enforceable contracts under Montana law.  *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 15, 349 Mont. 475, 204 P.3d 694; § 27-5-114, MCA.   Federal policy similarly places arbitration agreements on equal footing with other contracts.  9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, 131 S. Ct. 1740, 1745 (2012).  The Federal Arbitration Act (FAA) governs contracts that involve interstate commerce.  9 U.S.C. § 2; *Perry v. Thomas*, 482 U.S. 483, 489, 107 S. Ct. 2520, 2525 (1987).

¶12    The U.S. Supreme Court has clarified that, under the FAA, when a party challenges the validity of a contract as a whole, an arbitrator should resolve that dispute in the first instance.  *Nitro-Lift Techs., L.L.C. v. Howard*, ___ U.S. ___, 133 S. Ct. 500, 503 (2012).  When a party challenges the validity of the arbitration clause in a contract, however, a court may resolve that dispute in the first instance.  *Nitro-Lift*, ___ U.S. ___,

4

133 S. Ct. at 503. In reviewing the validity of the arbitration clause, however, a state court must apply state law that arose to govern the validity, revocability, and enforceability of contracts generally. *Kortum-Managhan*, ¶ 17; *Concepcion*, ___ U.S. at ___, 131 S. Ct. at 1746.

¶13 Kelker challenges both the validity of the arbitration clause of the Loan Agreement and the validity of the entire Loan Agreement. We consider only Kelker's challenge to the arbitration clause of the Loan Agreement. A party cannot be forced to arbitrate a dispute that she has not agreed to submit to arbitration. *State ex rel. Bullock v. Philip Morris, Inc.*, 2009 MT 261, ¶ 15, 352 Mont. 30, 217 P.3d 475. A court should first determine whether the parties agreed to arbitrate a matter. *Bullock*, ¶ 15; *Solle*, ¶ 22.

¶14 Kelker contends that generally applicable Montana contract law renders the arbitration clause unenforceable. Kelker relies on *Kortum-Managhan* in urging this Court to find the arbitration clause unenforceable. Geneva-Roth concedes that this Court can determine the validity of the arbitration clause itself. Geneva-Roth argues, however, that the arbitration agreement cannot be deemed invalid under generally applicable Montana contract law. Geneva-Roth further argues that *Concepcion* changed the way that the U.S. Supreme Court interpreted the FAA, and, therefore, pre-empted our analysis of the FAA set forth in *Kortum-Managhan*.

¶15 *Concepcion* struck down the California "Discover Bank" rule that deemed unconscionable all arbitration clauses that prevented class actions. *Concepcion*, ___ U.S. at ___, 131 S. Ct. at 1746. The Court determined that the FAA preempted state law rules, such as the "Discover Bank" rule, that prohibit outright the arbitration of a particular type

5

of claim. *Concepcion*, ___ U.S. at ___, 131 S. Ct. at 1747. The Court specifically reiterated, however, that the FAA preserves "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Concepcion*, ___ U.S. at ___, 131 S. Ct. at 1746, citing *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656 (1996). The Court also cited *Doctor's Associates* for the proposition that these generally applicable contract formation defenses cannot be available solely to challenge an arbitration clause, or derive their meaning from the fact that an agreement to arbitrate is at issue. *Concepcion*, ___ U.S. at ___, 131 S. Ct. at 1746.

¶16 We recognized in *Kortum-Managhan* that the FAA permits this Court to apply only law that arose "to govern issues concerning the validity, revocability, and enforceability of contracts generally" to determine the validity of an arbitration clause. *Kortum-Managhan*, ¶ 17. The Court also cited *Doctor's Associates* in *Kortum-Managhan* for this same proposition. *Kortum-Managhan*, ¶ 17. *Concepcion* restated the law on which this Court relied in *Kortum-Managhan*: that generally applicable contract law governs the validity of an arbitration clause. *Concepcion*, ___ U.S. at ___, 131 S. Ct. at 1746. Accordingly, *Concepcion* did not alter the U.S. Supreme Court's interpretation of the FAA in any manner that would invalidate our analysis in *Kortum-Managhan*.

*Generally Applicable Defense to Contract Formation*

¶17 Geneva-Roth next argues that this Court applied to the arbitration clause in *Kortum-Managhan* a contract formation defense available solely to challenge an arbitration clause in violation of *Concepcion*. We stated in *Kortum-Managhan* that

6

generally applicable contract law provides that an adhesion contract "will not be enforced against the weaker party if it is (1) not within their reasonable expectations, or (2) within their reasonable expectations, but, when considered in its context, proves unduly oppressive, unconscionable or against public policy." *Kortum-Managhan*, ¶ 23.

¶18 Although we list them separately, our "reasonable expectation" analysis represents a subset of whether a contract is "unconscionable." The subset of unconscionability based on reasonable expectations focuses on whether a party understood the contract. *Highway Specialties, Inc. v. State*, 2009 MT 253, ¶¶ 16-17, 351 Mont. 527, 215 P.3d 667. Even if a party fully understood the terms, however, a contract still can be unconscionable if the terms are too one-sided or oppressive. *Highway Specialties*, ¶ 12.

¶19 We discuss the interplay between unconscionability and reasonable expectations in *Highway Specialties*, where we analyzed for unconscionability a contractual provision for liquidated damages. The test for unconscionability involves a two-step inquiry: whether the contract qualifies as a contract of adhesion, and whether the contract unreasonably favored the drafter. *Highway Specialties*, ¶ 12. The "unreasonably favorable to the drafter" analysis includes an inquiry into "whether the provision was within the reasonable expectations of, or unduly oppressive to, the weaker party." *Highway Specialties*, ¶ 16.

¶20 We apply the same test that we applied in *Kortum-Managhan* when we consider the unconscionability of contracts generally, not solely when a contract includes an arbitration clause. We applied this analysis in *Highway Specialties* when we considered the unconscionability of a contract provision for liquidated damages. *Highway*

7

*Specialties*, ¶ 12. We again applied this test when we considered the unconscionability of a contract provision for liquidated damages in a lease in *Summers v. Crestview Apts.*, 2010 MT 164, 357 Mont. 123, 236 P.3d 586. We reiterated in *Summers* that unconscionability requires a two-fold determination: "that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions." *Summers*, ¶ 22. The "reasonable expectations" analysis that we used in *Kortum-Managhan* derives directly from generally applicable contract law rather than any unique law applicable only to arbitration agreements.

¶21 We consider the same factors when we analyze for unconscionability a contractual provision for arbitration as we do when we analyze for unconscionability a contract. *Kortum-Managhan*, ¶ 27; *Kelly v. Widner*, 236 Mont. 523, 528, 771 P.2d 142, 145 (1989). We listed in *Kortum-Managhan* a number of factors that a court should consider in determining whether a contractual provision proves unconscionable for being outside a party's reasonable expectations. These factors include whether the waiver clause was conspicuous and explained the consequences of the provision (e.g. waiver of the right to trial by jury and right of access to the courts); whether a disparity existed in the bargaining power of the contracting parties; whether a difference in business experience and sophistication of the parties existed; whether the party charged with the waiver was represented by counsel at the time the agreement was executed; whether economic, social or practical duress compelled a party to execute the contract; whether the parties actually

8

signed the agreement or separately initialed the waiver provision; and whether the waiver clause was ambiguous or misleading. *Kortum-Managhan*, ¶ 27.

¶22 The factors that we consider in evaluating a claim of unconscionability for an arbitration clause reflect the contract law of unconscionability generally. *Kortum-Managhan*, ¶ 27; *Kelly*, 236 Mont. at 528, 771 P.2d at 145; *West v. Club at Spanish Peaks, L.L.C.*, 2008 MT 183, ¶ 53, 343 Mont. 434, 186 P.3d 1228; *Fitzgerald v. Aetna Ins. Co.*, 176 Mont. 186, 190-91, 577 P.2d 370, 372 (1978). *Corbin on Contracts* recognizes that the existence of many of the factors that we analyze in *Kortum-Managhan* can render a contract unconscionable. 7-29 *Corbin on Contracts* § 29.4. These elements include a lack of meaningful choice, a contract offered on a take it or leave it basis, and a party that lacks sophistication. *Kortum-Managhan*, ¶ 27; 7-29 *Corbin on Contracts* § 29.4.

¶23 The Court applied these same factors in *Kelly* in considering whether a contract was unconscionable. Kelly had been seriously injured in an automobile accident. The insurance adjuster offered, and Kelly accepted, a small settlement in return for her release of claims. Kelly later challenged the release contract on grounds of unconscionability. *Kelly*, 236 Mont. at 527, 771 P.2d at 144-45.

¶24 The Court noted that the principle "of doing justice under the circumstances of each case" underlies the unconscionability analysis. *Kelly*, 236 Mont. at 528, 771 P.2d at 145. The Court further recognized that unconscionability lacks "a succinct or precise definition." *Kelly*, 236 Mont. at 528, 771 P.2d at 145. The Court listed elements, however, that may indicate unconscionability. *Kelly*, 236 Mont. at 528, 771 P.2d at 145.

9

These elements include unequal bargaining power of the parties, lack of meaningful choice, oppression, and exploitation of the weaker party's vulnerability or lack of sophistication. *Kelly*, 236 Mont. at 528, 771 P.2d at 145. The Court further cited J. Calamari and J. Perillo, *The Law of Contracts* § 56 (1970) for this same proposition. The Court examined Kelly's dire financial situation, her lack of education, and her lack of legal advice as factors that made her vulnerable to exploitation. *Kelly*, 236 Mont. at 528, 771 P.2d at 145.

¶25    This Court also considers whether ambiguities exist in all contracts, including contracts that contain arbitration clauses. *Club at Spanish Peaks*, ¶ 53; *Fitzgerald*, 176 Mont. at 190-91, 577 P.2d at 372; *Riehl v. Cambridge Court GF, LLC*, 2010 MT 28, ¶¶ 28-30, 355 Mont. 161, 226 P.3d 581. We recognized that "an ambiguity exists where the language of a contract, as a whole, reasonably is subject to two different interpretations." *Club at Spanish Peaks*, ¶ 53; *see also Riehl*, ¶ 26 (quoting *Club at Spanish Peaks* while analyzing an arbitration clause for ambiguity). If the court determines a contract has ambiguous terms, the court interprets the contract "most strongly" against the party who drafted it. *Club at Spanish Peaks*, ¶ 53.

¶26    The Court considered whether a car insurance contract contained an ambiguity in *Fitzgerald*. The insurance policy covered only automobiles not owned in whole or in part by the insured party. The insurance policy provided coverage for "hired automobiles." *Fitzgerald*, 176 Mont. at 190, 577 P.2d at 372. A dispute arose over the scope of the policy's coverage when the insured owned the trailer component of the tractor-trailer

involved in the accident. The insured party hired the tractor component of the tractor-trailer.

¶27 The Court determined that the entire tractor-trailer constituted one automobile. The Court further determined that the provision in the contract regarding the scope of coverage created an ambiguity. The contractual language could be interpreted to exclude coverage where the insured partially owned the automobile. The contract could be construed, in contrast, to provide coverage where the insured partially rented the automobile. *Fitzgerald*, 176 Mont. at 190-91, 577 P.2d at 372. The Court construed the ambiguity in the contract against the insurance company that had drafted the contract. The Court determined that the contract, interpreted against the drafter, provided coverage for the entire tractor-trailer involved in the accident. *Fitzgerald*, 176 Mont. at 191, 577 P.2d at 372.

¶28 This Court uses the same test and analyzes the same factors for possible unconscionability of arbitration clauses as we use to analyze the possible unconscionability of contracts generally. *Kortum-Managhan*, ¶ 27; *Highway Specialties*, ¶ 12; *Summers*, ¶ 22; *Kelly*, 236 Mont. at 528, 771 P.2d at 145; *Club at Spanish Peaks*, ¶ 53; *Fitzgerald*, 176 Mont. at 190-91, 577 P.2d at 372; *Riehl*, ¶¶ 26-30.

*Enforceability of the Arbitration Clause*

¶29 We evaluate the arbitration clause in the Loan Agreement to determine whether the arbitration clause was unconscionable under generally applicable Montana contract law. A contract is unconscionable if it is a contract of adhesion and the contractual terms unreasonably favor the drafter. *Highway Specialties*, ¶ 12. We consider whether the

11

contractual terms fell within Kelker's reasonable expectations as we analyze whether the contractual terms unreasonably favor the drafter. *Highway Specialties*, ¶ 12.

¶30 We first look to whether the loan agreement constitutes a contract of adhesion. A contract of adhesion involves a standard form contract prepared by one party, to be signed by a weaker party who has little choice about the terms. *Woodruff v. Bretz, Inc.*, 2009 MT 329, ¶ 8, 353 Mont. 6, 218 P.3d 486. A contract of adhesion arises when the stronger party gives the weaker party a choice either to accept, or to reject, the contract without the opportunity to negotiate its terms. *Woodruff*, ¶ 8.

¶31 No doubt exists that Geneva-Roth afforded Kelker no opportunity to negotiate the terms of the contract. Geneva-Roth presented Kelker with a contract on the Internet. Kelker either could accept or reject the standardized agreement. Geneva-Roth afforded Kelker no meaningful choice whether to accept any particular terms, including the arbitration provision. *Woodruff*, ¶ 8. The Loan Agreement qualifies as a contract of adhesion under these circumstances. *Woodruff*, ¶ 8.

¶32 The fact that the contract qualifies as one of adhesion does not by itself render the arbitration clause unconscionable. *Woodruff*, ¶ 13. We now must assess whether the arbitration clause unreasonably favors Geneva-Roth, including whether the arbitration clause fell outside Kelker's reasonable expectations. *Highway Specialties*, ¶ 12.

¶33 We consider the totality of the *Kortum-Managhan* factors in determining whether the arbitration clause fell within Kelker's reasonable expectations. *Kortum-Managhan*, ¶ 27; *Kelly*, 236 Mont. at 528, 771 P.2d at 145. The District Court determined that nearly all of these factors weigh against enforcement of the arbitration clause. We agree.

12

¶34 Kelker presented undisputed evidence in her affidavit that she did not understand the arbitration agreement. Nothing conspicuous denotes the arbitration clause. No bold or capital letters highlight the arbitration clause. Geneva-Roth highlighted several other sections of the Loan Agreement with bold or capital letters. Kelker alleges in her undisputed affidavit that no one explained the arbitration clause.

¶35 In fact, Kelker entered the contract over the Internet with no contact with any employees or representatives of Geneva-Roth. *Cf. Kluver v. PPL Mont., LLC*, 2012 MT 321, ¶ 26, 368 Mont. 101, 293 P.3d 817 (noting that proposed electronic memorandum had been "reviewed and approved by the parties and their counsel"). Kelker signed the Loan Agreement as a whole. She did not separately sign or initial the arbitration clause. No counsel represented Kelker when she signed the arbitration agreement. *See Kelly*, 236 Mont. at 528, 771 P.2d at 145 (determining that Kelly's lack of legal advice represented an important factor in finding the contract unconscionable).

¶36 Kelker asserts further that a difference in business experience and sophistication of the parties existed at the time that she executed the Loan Agreement. Geneva-Roth has presented no evidence to suggest that Kelker qualifies as a sophisticated party with significant business experience. Further, it appears that economic duress compelled Kelker to enter into this contract for a $600 payday loan with a 780% APR. *See Kelly*, 236 Mont. at 528, 771 P.2d at 145 (determining that Kelly's dire financial situation and her lack of education represented important factors in finding the contract unconscionable).

¶37 Ambiguities also plague the arbitration clause. The sentence before the arbitration clause provides that the Loan Agreement "does not constitute a waiver of any of Customer's rights to pursue a claim individually." The arbitration clause follows immediately. The arbitration clause indicates that the parties agree "to arbitrate disputes." The arbitration clause further purports to give the consumer notice that "[w]ithout this arbitration agreement, both parties have the right to litigate disputes through the law courts but we have agreed instead to resolve disputes through binding arbitration." These two clauses, that the consumer does not waive any of her rights, and that the consumer waives her right to litigation in court, cannot easily be reconciled. *Kortum-Managhan*, ¶ 27; *Riehl*, ¶¶ 26-30. The language gives rise to two reasonable interpretations: that Kelker maintained all of her rights, including her right to a trial, or that Kelker gave up her right to a trial and must submit to arbitration. *Club at Spanish Peaks*, ¶ 53; *Fitzgerald*, 176 Mont. at 190-91, 577 P.2d at 372. We generally construe an ambiguity in a contract against the party who drafted the contract—in this case, Geneva-Roth. *Club at Spanish Peaks*, ¶ 53; *Fitzgerald*, 176 Mont. at 190-91, 577 P.2d at 372.

¶38 We have considered the validity of the arbitration clause in the Loan Agreement using generally applicable Montana contract law. *Kortum-Managhan*, ¶ 27. The arbitration clause qualifies as a contract of adhesion and falls outside Kelker's reasonable expectations, and, therefore, the arbitration clause is unconscionable. *Highway Specialties*, ¶ 12; *Kortum-Managhan*, ¶ 27.

¶39 Affirmed.

14

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT

Justice Patricia O. Cotter specially concurs.

¶40    I concur in the result reached by the Court, but would deem the arbitration clause unenforceable on alternative grounds.

¶41    Section 27-5-114, MCA, is a provision of the Uniform Arbitration Act entitled Validity of arbitration agreement – exceptions.   Section 27-5-114(2), MCA, provides generally that a written agreement to submit to arbitration a controversy arising between the parties after the agreement is made is valid and enforceable except on legal or equitable grounds that exist for revocation of a contract.  However, subsection (2)(b) goes on to provide that the provision does *not* apply to "any contract by an individual for the acquisition of real or personal property, services, or money or credit when the total consideration to be paid or furnished by the individual is $5,000 or less."

¶42    Prior to 1989, the statute provided that arbitration clauses in contracts in which the total payable consideration was $35,000 or less, were not subject to the enforcement provisions of the statute.  In February 1989, Senator Bruce Crippen introduced SB 363, proposing to amend the statute.  SB 363 was entitled:

> An act allowing parties to a contract for the acquisition of real or personal property, services, or money or credit to agree to submit any future contractual disputes to arbitration, regardless of the dollar amount of the

15

contract; deleting the dollar amount limitation for contracts that may contain such arbitration agreements.

Senator Crippen thus proposed to eliminate any dollar limitations for contracts that may contain enforceable arbitration agreements. During hearings on the bill in the House and Senate, proposals were made to lower the limitation rather than eliminate it altogether. Ultimately, the legislators agreed to the $5,000 limit that remains in place today. It does not appear that this Court has previously been called upon to apply this statute.

¶43 Kelker entered into a $600 payday loan with Geneva. According to the loan agreement, she would pay $180 in interest if the loan was paid on her nearest payday, for a total payment of $780. Clearly, even if Kelker was a few months late in making her payment, the total consideration she would have to pay would not exceed $5,000.

¶44 I appreciate that this argument was not advanced in the District Court, and I also appreciate that we do not typically determine cases on the basis of arguments not made. *See Pinnow v. Mont. State Fund*, 2007 MT 332, ¶ 15, 340 Mont. 217, 172 P.3d 1273 (citations omitted). However, because here we are dealing with the waiver of fundamental rights, including the right to access to the court system, the right to trial by jury, and the right to an appeal, and because our Legislature has made a policy determination with respect to what contracts should be subject to mandatory arbitration, I feel it appropriate and necessary to apply the statute. As Justice Baker observes in her Dissent, it is not unreasonable for states to impose more stringent standards for evaluating the waiver of fundamental rights. Dissent, ¶ 55.

¶45   The Legislature of Montana has declared that arbitration clauses contained in contracts are enforceable when the total consideration to be paid is over $5,000. The corollary, of course, is that arbitration clauses contained in contracts when the total consideration is under $5,000 are not enforceable. I would apply the provisions of § 27-5-114(2)(b), MCA, to this contract, and declare the arbitration clause unenforceable under the facts before us here.

¶46   I therefore specially concur.

/S/ PATRICIA COTTER

Justice Beth Baker, dissenting.

¶47   Although well-intentioned, the Court's decision fosters a rule of state law with "disproportionate impact on arbitration agreements," *Concepcion*, 131 S. Ct. at 1747, prohibited by federal law and controlling decisions of the U.S. Supreme Court. The Court also overlooks a key factor in our generally applicable analysis of contract unconscionability by failing to evaluate the specific language of the arbitration provision at issue. For these reasons, and because the District Court erred in its analysis of the Loan Agreement's arbitration clause by considering the validity of the agreement as a whole, I dissent.

¶48   I begin with the full language of the arbitration provision at issue, which is omitted from the Court's opinion. The Loan Agreement to which Kelker agreed provides:

> Both parties agree that any claim, dispute, or controversy between us, any claim by either party against the other or the agents, services, or assigns of the other, including the validity of this agreement to arbitrate disputes as

17

well as claims alleging fraud or misrepresentation shall be resolved by binding arbitration.[1] Any arbitration hearing, if one is held, will take place at a location near Customer's residence and shall be conducted by a mutually agreed to and certified arbitrator. Customer's arbitration fees will be waived in the event you cannot afford to pay them. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act 9. [sic] USC Section 1-18. Judgment upon the award may be entered by any party in court having jurisdiction. Notice: Without this arbitration agreement, both parties have the right to litigate disputes through the law courts but we have agreed instead to resolve disputes through binding arbitration.

¶49 The District Court's decision recognized "a good argument" that the arbitration provision is enforceable, based upon *Concepcion*. The court noted that this Court had not addressed its historic concern with arbitration provisions since *Concepcion* was decided and that there appeared to be some "tension" between our precedents and the U.S. Supreme Court's directives. The District Court applied Montana law requiring that, in order for a contract of adhesion to be unenforceable, it must be "(1) not within [the challenging party's] reasonable expectations or (2) within her reasonable expectations, but when considered in its context, proves unduly oppressive, unconscionable, or against public policy." (citing *Zigrang v. U.S. Bancorp Piper Jaffray, Inc.*, 2005 MT 282, ¶ 13, 329 Mont. 239, 123 P.3d 237). The District Court held that the Loan Agreement's provision requiring arbitration "may well have been within Kelker's reasonable expectations." Considering the arbitration provision "<u>in its context</u>," however, the court found the arbitration provision "unduly oppressive, unconscionable, and against public policy." (Emphasis in original.) The "primary factor" in the court's determination was

---

[1] The validity of the agreement to arbitrate is, as the Court observes (Opinion, ¶¶ 11-12), a matter for the court to decide. Geneva-Roth does not contest this point.

the "extraordinarily exorbitant" interest rate of 780% that Kelker was charged under the Loan Agreement. In considering the context of the contract and its provisions, the District Court could not "stand by" and overlook what it viewed as a clearly oppressive term in the Agreement.

¶50 The District Court erred as a matter of law by considering the contract as a whole in determining the validity of the arbitration provision. As we recognized in *Martz v. Beneficial Montana, Inc.*, 2006 MT 94, 332 Mont. 93, 135 P.3d 790, the U.S. Supreme Court has "made clear that arbitration, not court, is the proper forum for challenges to contracts as a whole where those contracts contain arbitration provisions." *Martz*, ¶ 17 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 447, 126 S. Ct. 1204, 1209-10 (2006)). Thus, it is the arbitration provision itself that must be examined to determine (1) whether it is within Kelker's reasonable expectations and, if so, (2) whether it nonetheless is unduly oppressive, unconscionable, or against public policy.

¶51 While the Court does not adopt the District Court's rationale, it invalidates the arbitration clause on the sole ground that it was outside Kelker's reasonable expectations, professing to rely on "generally applicable contract law." The Court reaches this conclusion based on the ten-factor test adopted in *Kortum-Managhan*.

¶52 Although the Court emphasizes repeatedly that *Kortum-Managhan* recognized the obligation to apply generally applicable contract law, it fails to mention two important aspects of our decision in that case. First, one of the principal bases for our holding that the arbitration agreement was not within Kortum-Managhan's reasonable expectations was its inclusion in a "bill stuffer" long after she accepted the credit card agreement.

19

Kortum-Managhan was deemed to have accepted the terms of the arbitration agreement simply by continuing to use her credit card. *Kortum-Managhan*, ¶ 7. Here, Kelker acknowledges that in order to be eligible for the loan, she had to click "I Agree" to the terms and conditions of the Loan Agreement, which expressly included the agreement to arbitrate disputes. By clicking "I Agree," she voluntarily engaged in an electronic transaction with Geneva-Roth subject to the same rules as the formation of any other contract. Sections 30-18-104(2) and -113(2), MCA; *Kluver v. PPL Mont., LLC*, 2012 MT 321, ¶ 23, 368 Mont. 101, 293 P.3d 817.

¶53 Outside the arbitration context, our generally applicable principles of contract law presume that "[a]bsent incapacity to contract, ignorance of the contents of a written contract is not a ground for relief from liability" under its provisions. *Quinn v. Briggs*, 172 Mont. 468, 476, 565 P.2d 297, 301 (1977); *Gliko v. Permann*, 2006 MT 30, ¶ 35, 331 Mont. 112, 130 P.3d 155 (noting that each party was presumed to have read the contract and "had a duty to understand the terms of the agreement"); *First Sec. Bank v. Kyle Abel & Abel Enters.*, 2008 MT 161, ¶ 29, 343 Mont. 313, 184 P.3d 318 ("[i]t is well established in Montana that one who executes a written contract is presumed to know the contract's contents"); *Stowers v. Community Med. Ctr., Inc.*, 2007 MT 309, ¶ 12, 340 Mont. 116, 172 P.3d 1252 (plaintiff's failure to read the agreement before signing did not relieve him from its terms); *Wiley v. Iverson*, 1999 MT 214, ¶ 23, 295 Mont. 511, 985 P.2d 1176 ("[t]he duty to inquire prior to signing an antenuptial contract is consistent with the general rule [of contract law] in Montana"). Likewise, in contexts other than agreements to arbitrate, we have held that expectations contrary to clear terms of a

contract are not objectively reasonable. *Newbury v. State Farm Fire & Cas. Ins. Co.*, 2008 MT 156, ¶ 35, 343 Mont. 279, 184 P.3d 1021 (citing *Mont. Petroleum Tank Release Compen. Bd. v. Crumleys, Inc.*, 2008 MT 2, ¶ 35, 341 Mont. 33, 174 P.3d 948).

¶54 Because an arbitration provision waives fundamental rights, however, we have applied a more stringent standard when faced with a consumer's claim that she has not read or understood the arbitration clause in a contract. *Woodruff v. Bretz, Inc.*, 2009 MT 329, ¶¶ 14-15, 353 Mont. 6, 218 P.3d 486; *Kortum-Managhan*, ¶ 26; *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 28, 310 Mont. 123, 54 P.3d 1, *see also* ¶¶ 64-65 (Nelson, J., specially concurring). Kelker's acceptance of the terms of the Loan Agreement are distinct from the "addition of completely new terms and conditions" through the "bill stuffer" used by Herbergers, *Kortum-Managhan*, ¶ 22, and her failure to read the Agreement does not remove the arbitration provision from her reasonable expectations.

¶55 The second aspect of *Kortum-Managhan*'s ten-factor test the Court overlooks is that it expressly was to be used to determine "whether an individual deliberately, understandingly and intelligently waived their fundamental constitutional rights to trial by jury and access to the courts[.]" *Kortum-Managhan*, ¶ 27. The fact that arbitration clauses, "by their very nature," waive the rights "to trial by jury, access to the courts, due process of law and equal protection of the laws" required application of the standards reserved for effective waiver of a constitutional right. The ten-factor test was derived from the fundamental nature of the rights given up by arbitration, thereby demanding proof that the waiver was made "voluntarily, knowingly and intelligently," which in turn required "that a consumer must be informed of the consequences before personally

21

consenting to the waiver." *Kortum-Managhan*, ¶ 26. Since *Kortum-Managhan* was decided, we have applied its ten-factor test *only* to evaluate an arbitration clause. *Woodruff*, ¶ 15. Drawing from the *Kortum-Managhan* factors, the Court suggests that Kelker was compelled by "economic duress" to sign a contract that called for a 780% APR. Opinion, ¶ 31. The Court cites no generally applicable principle of contract law for this proposition and incorporates the District Court's error of looking to unconscionability of the contract as a whole in evaluating the agreement to arbitrate.

¶56 It is not unreasonable that a State should impose more stringent standards for evaluating the waiver of fundamental constitutional rights. In doing so, however, we have created a state-law rule with "disproportionate impact on arbitration agreements," *Concepcion*, 131 S. Ct. at 1747, which the U.S. Supreme Court has viewed as the "type of 'judicial hostility towards arbitration'" that is expressly foreclosed by the FAA, *Nitro-Lift*, 133 S. Ct. at 503. Like it or not, we are bound by those rulings. U.S. Const. Art. VI, cl. 2.

¶57 Under *generally applicable* principles of contract law, our analysis of contracts of adhesion for unconscionability should include examining the challenged provision itself to determine whether it is "unreasonably favorable to the drafter," "unduly oppressive, or against public policy." *Highway Specialties*, ¶ 16; *Summers*, ¶¶ 22, 24; *Iwen v. U.S. W. Direct*, 1999 MT 63, ¶ 31, 293 Mont. 512, 977 P.2d 989. The same section of Corbin on Contracts cited by the Court notes that "the purpose of the [unconscionability] doctrine is to prevent two evils: *oppression* and *unfair surprise*." 7 J. Perillo, *Corbin on Contracts*, § 29.4 at 388 (emphasis in original). This echoes our statement in *Kelly* where, citing the

22

identical UCC Comment, we noted that the "principle is one of the prevention of oppression and unfair surprise." *Kelly*, 236 Mont. at 527, 771 P.2d at 145 (citing to UCC § 2-302 cmt. 1). The Court's opinion in this case lacks any such analysis.

¶58    The arbitration clause in the Loan Agreement, unlike that invalidated as unconscionable in *Iwen*, is not one-sided and does not unreasonably favor Geneva-Roth. It provides for mutual consent to an arbitrator, proceedings near the consumer's home, and waiver of fees if the consumer cannot afford them. Unlike *Iwen*, it does not grant only the party with superior bargaining power the right to go to court. Given the FAA's "national policy favoring arbitration," *Nitro-Lift*, 133 S. Ct. at 503 (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S. Ct. 852, 858 (1984)), the provision cannot be said to violate public policy. Analyzed in light of cases outside the arbitration context, such as *Highway Specialties*, *Summers*, and *Kelly*, it is difficult to determine how this provision is unconscionable, except that—like any arbitration agreement—it waives Kelker's right to a jury trial and access to the courts.

¶59    In short, removing *Kortum-Managhan*'s heightened standard of unconscionability from the analysis, the Loan Agreement's arbitration provision would not be subject to invalidation under our generally applicable principles of contract law. "[T]he times in which consumer contracts were anything other than adhesive are long past." *Concepcion*, 131 S. Ct. at 1750. Unfortunately, the fact that the Loan Agreement Kelker accepted is typical of such adhesive consumer Internet transactions does not make its arbitration provisions less worthy of enforcement than other contracts subject to the FAA. I would reverse the District Court's denial of Geneva-Roth's motion to compel arbitration and

23

allow the arbitrator to determine whether the Loan Agreement's 780% APR makes the contract as a whole unconscionable.


/S/ BETH BAKER


Justice Jim Rice joins in the dissenting Opinion of Justice Beth Baker.


/S/ JIM RICE