FILED

04/03/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0124

DA 17-0124

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 67

BEVERLY LENZ, DARINDA WILLIAMS, TERRANCE
BRADY, DEAN A. HOISTAD, LARRY VERVICK
and RICHARD W. HORTON,

      Plaintiffs and Appellants,

   v.

FSC SECURITIES CORPORATION, ROCKY MOUNTAIN
FINANCIAL ADVISORS, LLC, f/k/a ROCKY MOUNTAIN FINANCIAL, LLC,
ERIC D. ROLSHOVEN and JOHN DOES 1-10,

      Defendants and Appellees.

APPEAL FROM:   District Court of the Fourth Judicial District,
                  In and For the County of Missoula, Cause No. DV 15-725
                  Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           John M. Morrison, Linda Deola, Morrison Sherwood Wilson &
           Deola, PLLP, Helena, Montana

      For Appellee:

           Charles H. Carpenter, Carpenter Law Firm, Missoula, Montana
           (for Eric D. Rolshoven)

           Kevin D. Feeback, Toole & Feeback, PLLC, Lincoln, Montana

           Edward S. Zusman, Amir Tadjedin, Ryan Probstfeld, Markun Zusman
           Freniere and Compton, LLP, Portland, Oregon

Submitted on Briefs:  November 8, 2017

Decided:  April 3, 2018

Filed:

_____
                    Clerk

2

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Beverly Lenz, Darina Williams, Terrance Brady, Dean A. Hoistad, Larry Vervick, and Richard W. Horton (collectively Investors) appeal the order of the Montana Fourth Judicial District Court staying proceedings and compelling them to submit all asserted claims against FSC Securities Corporation (FSC) and Rocky Mountain Financial Advisors, L.L.C. (f/k/a/ Rocky Mountain Financial, L.L.C.), and Eric D. Rolshoven (collectively RMF) to arbitration. We affirm and restate the dispositive issues as:

> 1. Did the District Court erroneously conclude that Investors knowingly and voluntarily assented to the subject arbitration agreements and validly waived their rights to full legal redress and jury trial?
>
> 2. Did the District Court correctly conclude that the subject arbitration agreements were not unconscionable?

## BACKGROUND

¶2 FSC is a Delaware-chartered, Georgia-based corporation registered with the United States Securities and Exchange Commission (SEC) to provide interstate securities brokerage and investment advisory services. RMF is a Montana-registered, limited liability company, that was engaged in the business of providing licensed financial and securities brokerage services as registered representatives of FSC. Eric Rolshoven (Rolshoven) and broker Barry Hartman (Hartman) were agents of RMF, and registered representatives of FSC, doing business in Missoula, Montana. Invizeon was a Missoula-based corporation engaged in raising investment capital, purportedly to support business plans to aid in the marketing of various security-related technology products.

3

¶3      Between 2003 and 2014, on the recommendation of RMF brokers and advisors, a number of investors, including Investors, purchased securities in Invizeon Corporation through FSC.[1]   In 2015, Invizeon failed, causing Investors to sustain substantial losses. Investors promptly sued FSC and RMF in the Montana Fourth Judicial District Court, alleging that FSC failed to adequately supervise its registered RMF representatives and that RMF wrongfully induced Investors to invest in Invizeon on various grounds including misrepresentation, fraud, and undisclosed self-dealing.  Eight months into the litigation, FSC and RMF separately moved to stay proceedings and compel arbitration before the Financial Industry Regulatory Authority (FINRA).[2]  Following briefing and oral argument on the motions, the District Court conducted a supplemental evidentiary hearing.

¶4      Over the course of multiple, day-long hearings, the District Court heard testimony from each Investor regarding his or her recollection of the specific contract documents and related circumstances.  All Investors testified that they did not recall reading or receiving a standard-form FSC customer agreement that included a detailed arbitration agreement. Each Investor described his or her educational background and prior investment experience.  Though several Investors recalled receiving significant paperwork when they opened their RMF accounts, none recalled reading or receiving the customer agreement form.  However, all Investors recalled seeing and reading an arbitration notice printed

[1] Investors also purchased other securities through FSC/RMF throughout this period.

[2] FINRA is a private corporation that acts under the approval of the SEC as an industry self-regulatory organization regulating member brokerage firms and exchange markets to ensure fair and honest industry operations.  At all times pertinent, FSC was a FINRA member.

above the signature block on the separate client application form. The Investors testified that they had no recollection of anyone at RMF advising them of the legal significance of the arbitration agreement.

¶5     FSC's Senior Litigation Counsel Greg Curley (Curley) testified as to the standard FSC protocol followed by FSC representatives in opening brokerage accounts. Each FSC brokerage agreement consisted of a separate client application form, customer agreement form, signature page form, and an account worksheet generated and maintained by FSC's computerized account management system. Whether viewed in electronic or hard-copy form, the transaction documents for each FSC brokerage agreement were readily identifiable by account name, number, and cross-referenced transaction forms identified by version reference. Initiating RMF representatives opened each account through the FSC account management system by selecting the constituent transaction forms from a menu screen which then set up an electronic account record for each client. Upon initiation of each new client account, the system generated a hard copy of all initial transaction documents for client review and signature in the form of a single document print-out. Pursuant to standard FSC policy and procedure, RMF retained each client's signed application signature form and provided a hard-copy of all transaction documents to the client.

¶6     The three-page customer agreement form contained detailed language explaining the arbitration process relative to litigation, stated the parties' agreement to resolve any and all disputes through binding arbitration, and declared that the agreement effected a waiver of the client's litigation rights, including, *inter alia*, the right to a jury trial. Though FSC

did not require Investors to initial or sign the customer agreement form, the application signature page forms conspicuously referenced the customer agreement form as part of the agreements and conspicuously stated in bold-print directly above one of two customer signature blocks that:

> The Customer Agreement contains a pre-dispute Arbitration Provision. This Provision is contained in this agreement and appears in bold print. *I hereby acknowledge* by my signature below, *receipt of a copy of this agreement.*

(Emphasis added.) FSC did not require the initiating RMF representative to further discuss or explain the arbitration agreements with clients beyond the express language of the transaction forms.

¶7 Kay Hartman (Kay), wife of RMF broker and registered FSC representative Barry Hartman, assisted with clerical duties, including preparing, printing, and providing account packets to clients upon opening of new accounts at RMF. Kay testified that she assisted with new accounts by obtaining and inputting client information into the FSC system. Kay also printed the various transaction documents for client review, verified social security numbers, and obtained client signatures. Kay testified that, if she had any reason to believe that a client did not receive or leave the office with copies of all transaction documents, it was her practice to mail copies to the client with a note to contact her or Mr. Hartman with any questions. Kay further testified that it was her standard practice to tell clients that the account application documents made them FSC clients and that the referenced customer agreement form provided for mandatory arbitration of any dispute related to the account. There is no evidence that any of the Investors ever questioned, objected to, or stated any concern about the arbitration provisions referenced in any of the FSC account documents.

6

Kay testified that she mailed complete transaction document packets to two of the Investors after signing.

¶8     Although the language of the customer agreements forms varied slightly over time, Curley testified that the arbitration agreement language remained substantially similar at all times pertinent.  *Inter alia*, the customer agreement forms included the following arbitration agreement and disclosure in bold type:

Arbitration

1.  Arbitration Disclosure

This agreement contains a pre-dispute arbitration clause.  By signing an arbitration agreement the parties agree as follows:

- All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.
- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration that in court proceedings.
- The arbitrators do not have to explain the reason(s) for their award.
- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration.  In some cases, a claim that is ineligible for arbitration may be brought in court.
- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

2.  Agreement to Arbitrate Controversies

You agree that any and all controversies which may arise between you, FSC, Pershing LLC, and/or any of FSC's employees, agents, or officers concerning any account, transaction, dispute or the construction, performance, breach, or termination of this Agreement or any other

7

agreement, whether entered into prior to, on or subsequent to the date hereof, shall be determined and resolved by arbitration. Any arbitration under this Agreement shall be held under and pursuant to and governed by the Federal Arbitration Act, and shall be conducted before an arbitration panel convened by the American Arbitration Association or NASD Dispute Resolution.[3] You may also select any other national securities exchange's arbitration forum in which FSC is legally bound to arbitrate the controversy, including, where applicable, the Municipal Securities Rulemaking Board. Any arbitration pursuant to this Agreement shall be governed by the rules of the organization convening the arbitration panel. The award of the arbitrators, or a majority of them, shall be final, and judgment on the award may be entered in any court of competent jurisdiction. A party's ability to have a court reverse or modify an arbitration award is very limited.

The customer agreement forms distinctly set forth the language of the arbitration agreement in bold print, separate from the other terms and conditions in the customer agreement. At hearing, each Investor acknowledged and authenticated his or her signature on at least one FSC account application.[4] After each account opening, FSC mailed periodic account statements to each Investor that, *inter alia*, included a detailed notice including arbitration agreement language similar to that set forth in the original customer agreement form.[5]

¶9 On February 8, 2017, following supplemental post-hearing briefing, the District Court issued extensive findings of fact, conclusions of law, and an order compelling Investors to submit their claims to arbitration as provided in the FSC customer agreement forms. Based on the testimony of individual Investors, the court found that each Investor

---

[3] The National Association of Securities Dealers (NASD) was the SEC-approved predecessor of FINRA.

[4] Some of the Investors signed several FSC account applications as a result of opening multiple accounts.

[5] FSC presented uncontradicted testimony that it regularly issued account statements to clients for every month in which a client conducted an account transaction and at least quarterly each year.

received actual notice of the arbitration agreement. The court further found that all of Investors were highly educated and sophisticated market investors with extraordinary business acumen. The plaintiffs included a lawyer, a certified public accountant, two banking executives, and highly successful business people, all knowledgeable and experienced market investors. The court found that none of the investors were under any duress or "physical or emotional compulsion" and that there was no evidence or allegation that FSC or RMF induced Investors to enter into the subject brokerage agreements by duress, fraud, misrepresentation, or other unlawful conduct.[6]

¶10 Though the District Court determined that all agreements were non-negotiated contracts on terms dictated by FSC, the court further concluded that the standard-form contracts, including the arbitration agreements, were within the reasonable expectations of each client and were not oppressive, unconscionable, or contrary to public policy. The court found that each of the plaintiffs "signed at least one, and sometimes more than one, account opening document . . . confirm[ing that] 'the Customer Agreement contain[ed] a pre-dispute Arbitration Provision'" and that each expressly acknowledged receipt of the customer agreement form by signature and through the following signature page advisory:

> THE TRADITIONAL INDIVIDUAL RETIREMENT CUSTODIAL ACCOUNT PLAN ("ACCOUNT PLAN") THAT ACCOMPANIES THIS ADOPTION AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE, WHICH MAY AFFECT RIGHTS UNDER THE PLAN. THE PREDISPUTE ARBITRATION CLAUSE IS LOCATED IN ARTICLE VIII, SECTION 11(i) ON PAGES 7 & 8 OF THE ACCOUNT PLAN. BY SIGNING THIS IRA ADOPTION AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ THE PREDISPUTE

---

[6] Investors' second amended complaint alleged, *inter alia*, that brokers tortiously induced them to purchase Invizeon securities subsequent to execution of their FSC brokerage account agreements.

9

ARBITRATION CLAUSE, UNDERSTAND IT, AND AGREE TO BE BOUND BY IT.

The District Court found and concluded that no fiduciary relationship existed between FSC/RMF and any of the plaintiffs and, thus, FSC/RMF had no duty to further explain the legal significance of the arbitration agreements beyond their express written language. The court further found that all of the FSC transaction forms were "subject to regulatory approval" and that there was no evidence or assertion that the forms did not conform with applicable securities regulations.

¶11 Though the arbitration language in each account agreement differed slightly depending on the version the forms in use at time of execution, the District Court determined that the arbitration agreement language in each form was substantively similar, clear, and unambiguous. The court ultimately concluded that each Investor had knowingly and voluntarily executed a valid arbitration agreement and associated waiver of their Montana constitutional rights to full legal redress and a jury trial.[7] The court thus granted the motions of FSC and RMF and compelled the Investors to submit to binding arbitration before FINRA. Upon obtaining an order to stay proceedings pending appeal, six of the original eleven plaintiffs timely appeal.

## STANDARD OF REVIEW

¶12 We review district court conclusions of law, and resulting orders compelling arbitration, de novo for correctness. *Global Client Solutions, LLC v. Ossello*, 2016 MT 50, ¶ 19, 382 Mont. 345, 367 P.3d 361 (citing *Kelker v. Geneva-Roth Ventures*, 2013 MT 62,

---

[7] See Mont. Const. art. II, §§ 16 and 26 (rights to full legal redress/access to courts and jury trial).

¶ 9, 369 Mont. 254, 303 P.3d 777); *Hurly v. Lake Cabin Dev., LLC*, 2012 MT 77, ¶ 14, 364 Mont. 425, 276 P.3d 854. When a district court compels arbitration pursuant to a motion to dismiss or summary judgment, we review the order for correctness under the standards of M. R. Civ. P. 12 or 56, as applicable. *See Day v. CTA, Inc.*, 2014 MT 119, ¶¶ 4-6, 375 Mont. 79, 324 P.3d 1205; *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 12, 349 Mont. 475, 204 P.3d 693; *Young v. Security Union Title Ins. Co.*, 1998 MT 335, ¶ 17, 292 Mont. 310, 971 P.2d 1233. When a court compels arbitration upon a contested evidentiary hearing, we review the court's findings of fact for clear error. *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 43, 310 Mont. 123, 54 P.3d 1; *Chor v. Piper, Jaffray & Hopwood, Inc.*, 261 Mont. 143, 153, 862 P.2d 26, 32 (1993). Findings of fact are clearly erroneous only if not supported by substantial evidence, the court misapprehended the effect of the evidence, or our review of the record leaves us with a definite and firm conviction that the court was mistaken. *Brown v. MacDonald*, 2007 MT 197, ¶ 8, 338 Mont. 390, 165 P.3d 1125.

**DISCUSSION**

¶13 Investors assert that the District Court erroneously stayed litigation of their claims and compelled them to submit to arbitration on the asserted grounds that FSC and RMF failed to satisfy their burden of proving that Investors (1) knowingly entered into integrated contractual agreements providing for arbitration and (2) validly waived their Montana constitutional rights to full legal redress and jury trial. Investors further assert that the District Court erroneously concluded that the standard-form arbitration agreements were not unconscionable.

11

¶14 Enacted in 1925 to offset "widespread judicial hostility to arbitration agreements," the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, mandates that arbitration agreements involving interstate commerce are valid and enforceable "on equal footing with all other contracts." *Thompson v. Lithia Chrysler Jeep Dodge of Great Falls*, 2008 MT 175, ¶ 12, 343 Mont. 392, 185 P.3d 332; *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 1745-46 (2011); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443-44, 126 S. Ct. 1204, 1207 (2006). The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements" regardless of any substantive or procedural state law to the contrary. *Perry v. Thomas*, 482 U.S. 483, 489, 107 S. Ct. 2520, 2525 (1987) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983)). The FAA encompasses a discrete "body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act." *Perry*, 482 U.S. at 489, 107 S. Ct. at 2525. Consequently, courts must stay litigation and compel arbitration on all claims subject to a valid and enforceable arbitration agreement. 9 U.S.C. § 3; *Moses H. Cone Memorial Hosp.*, 460 U.S. at 26, 103 S. Ct. at 942.[8] It is undisputed that the subject arbitration agreements involve interstate commerce and are thus subject to the FAA.

¶15 *1. Did the District Court erroneously conclude that Investors knowingly and voluntarily assented to the subject arbitration agreements and validly waived their rights to full legal redress and jury trial?*

---

[8] *See also* 9 U.S.C. § 4 (court shall compel arbitration "in accordance with the terms of the agreement" on motion and determination "that the making of the agreement for arbitration or the failure to comply therewith is not in issue"); *Merrill Lynch, Pierce, Fenner & Smith v. Haydu*, 637 F.2d 391, 395 (5th Cir. 1981) ("state court bound to apply" provisions of FAA "if statutory requisites are present").

¶16    Arbitration agreements are "valid, irrevocable, and enforceable" except "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2. Arbitration agreements governed by the FAA are subject to all generally applicable state law contract principles "such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339, 131 S. Ct. at 1746 (citing *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87, 116 S. Ct. 1652, 1656 (1996)).  State law may not defeat arbitration agreements based on "special rules which apply only to arbitration provisions." *Iwen v. U.S. West Direct*, 1999 MT 63, ¶ 26, 293 Mont. 512, 977 P.2d 989 (citing *Casarotto*, 517 U.S. at 687, 116 S. Ct. at 1656).  *Accord Kortum*, ¶ 17.

¶17    "The fundamental tenet of modern contract law is freedom of contract"—parties are free to "agree to terms governing their private conduct as long as those terms do not conflict with public laws." *Arrowhead School Dist. No. 75 v. Klyap*, 2003 MT 294, ¶ 20, 318 Mont. 103, 79 P.3d 250.  "This tenet presumes that parties are in the best position to make decisions in their own interest." *Arrowhead School Dist.*, ¶ 20.  Capable parties may contractually bind each other on valid consideration and mutual assent to all lawful contract terms and conditions. *See* §§ 28-2-101, -102, -202, -301, -303, -501, -602, and -701, MCA; *Kortum*, ¶ 18.  The threshold validity and enforceability of an arbitration agreement is a question of law but the limited role of the court is to enforce and give effect to the lawful agreement of the parties. *See Arrowhead School Dist.*, ¶ 20.

13

¶18 All contracts must contain four essential elements: (1) identifiable parties capable of contracting; (2) consent of the parties; (3) a lawful object; and (4) consideration. Section 28-2-102, MCA; *Kortum*, ¶ 18. Contract formation is based on the consent of the parties and arbitration is a matter of consent. *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248, 1256 (1989). Consent must be free, mutual, and communicated by each to the other. *Franks v. Kindsfather*, 2005 MT 51, ¶ 31, 326 Mont. 192, 108 P.3d 487; §§ 28-2-102, -301, MCA. We have further explained:

> There must be mutual assent or a meeting of the minds on all essential terms to form a binding contract. Consent is established when there has been an offer and an acceptance of that offer. More specifically, . . . in order to effectuate a contract there must be not only a valid offer by one party, but also an unconditional acceptance, according to its terms, by the other.

*Keesun Partners v. Ferdig Oil Co., Inc.*, 249 Mont. 331, 337, 816 P.2d 417, 421 (1991), (internal citations omitted). Contract terms to which the parties did not mutually assent are not valid and enforceable against a party who did not assent. *See Kortum*, ¶ 18; *Keesun Partners*, 249 Mont. at 337, 816 P.2d at 421. *See also* §§ 28-2-102(2), -301, -303, and -401, MCA (mutual assent standards).

¶19 In addition to compliance with generally applicable contract principles, arbitration agreements must also comply with state constitutional standards generally applicable to contracts. *Kortum*, ¶¶ 25-27. Arbitration agreements necessarily effect a waiver of a party's state and federal constitutional rights to full legal redress, jury trial, due process of

14

law, and equal protection of law.[9] *Kortum*, ¶ 26. The Montana constitutional rights to full legal redress and jury trial are fundamental rights entitled to the highest level of constitutional scrutiny and protection. *Kortum*, ¶¶ 25-26. A waiver of a fundamental Montana constitutional right is valid only if made knowingly, voluntarily, and intelligently under the totality of circumstances. *Kortum*, ¶¶ 26-27; *Park v. Montana 6th Jud. District Ct.*, 1998 MT 164, ¶ 36, 289 Mont. 367, 961 P.2d 1267 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)). As applied to contract waivers, relevant considerations include but are not limited to whether the waiver was the product of negotiation or dictated by the party with stronger bargaining position without opportunity for negotiation, whether the waiver provision was conspicuous and clearly explained the consequences of waiving rights to legal redress and jury trial, whether a disparity in business experience and sophistication existed between the parties, whether the waiving party had the assistance of counsel at the time of execution, whether the waiving party was under economic, social or practical duress compelling acceptance of the arbitration agreement (*e.g.* where a consumer service at issue is not reasonably available except on similarly dictated terms), whether the waiving party separately signed or initialed the waiver provision, whether the waiver provision was ambiguous or misleading, and "whether the party with the superior bargaining power lulled the inferior party into a belief that the waiver would not be enforced." *Kortum*, ¶ 27. Our *Kortum* requirement for a

---

[9] See Mont. Const. art. II, §§ 14, 16-17, 26 (right to equal protection of law, access to courts, due process of law, and jury trial); U.S. Const. amend. XIV (right to due process and equal protection of law).

15

knowing, voluntary, and intelligent contract waiver is not specific to arbitration agreements; it generally applies to any type of contract waiver of a fundamental Montana constitutional right.

¶20    Here, Investors do not dispute that they entered into the subject brokerage agreements based on mutual consent and consideration. Substantial evidence exists that the FSC brokerage contracts included a standardized client application form, an application form signature page, and a customer agreement form, *inter alia*. With minor variation, the signature page forms conspicuously, clearly, and unambiguously referenced a separate customer agreement form and conspicuously gave notice that the customer agreement form contained an arbitration agreement. Though generated and maintained in separate forms, the FSC system printed-out the application, customer agreement, and signature page forms in a single-document format for client review and signature. In both formats, the transaction documents clearly, conspicuously, and unambiguously stated and explained that the customer agreement form was an essential part of the contract terms to which Investors were assenting, the nature of arbitration in contrast to litigation, that all disputes arising from the agreement were subject to binding arbitration, and that the agreement effected a waiver of the rights to full legal redress and jury trial. The signature page form also clearly, conspicuously, and unambiguously stated and notified the signatory that, by signing, the client acknowledged receipt of a copy of the customer agreement form.

16

¶21     Though all but one of the plaintiffs proceeded without representation of counsel[10] and FSC/RMF indeed dictated the arbitration agreements with no opportunity for negotiation, substantial evidence manifests that all Investors were highly educated, experienced, knowledgeable, and sophisticated market investors.  Substantial evidence indicates that the Investors were well aware of, and more than capable of understanding, the nature of arbitration, that all account-related disputes would be subject to arbitration, and that they were waiving their rights to full legal redress and jury trial.  No evidence indicates that Investors' assent to the arbitration agreements was the product of non-disclosure, mistake, fraud, misrepresentation, coercion, or duress.  There is similarly no evidence that RMF induced or otherwise lulled the Investors into believing that RMF or FSC would not enforce the arbitration agreement.

¶22     A party who executes a written contract is presumed to have read and understood the contract and assented to its terms.  *Woodruff v. Bretz*, 2009 MT 329, ¶ 8, 353 Mont. 6, 218 P.3d 486; *First Sec. Bank v. Abel*, 2008 MT 161, ¶ 29, 343 Mont. 313, 184 P.3d 318; *Stowers v. Community Med. Ctr., Inc.*, 2007 MT 309, ¶ 12, 340 Mont. 116, 172 P.3d 1252; *Gliko v. Permann*, 2006 MT 30, ¶ 35, 331 Mont. 112, 130 P.3d 155.  Absent incapacity, mutual mistake, fraud, misrepresentation, or other tortious conduct affecting assent, ignorance or disregard of clear and unambiguous contract language "is not a ground for relief from liability."  *Wiley v. Iverson*, 1999 MT 214, ¶ 23, 295 Mont. 511, 985 P.2d 1176; *Quinn v. Briggs*, 172 Mont. 468, 474, 565 P.2d 297, 301 (1977).  A party to a clear and

_____

[10] One of the Investors was a licensed Montana lawyer.

unambiguous written contract "cannot avoid [its] legal consequences . . . simply by later claiming that she did not understand" the legal consequences "of the plain language of the contract." *Chor*, 261 Mont. at 149, 862 P.2d at 30.

¶23 Here, under the totality of the circumstances, the asserted fact that some or all Investors did not recall seeing or reading the customer agreement forms is insufficient to overcome the presumption that they read and understood the consequences of the clear and unambiguous language of the arbitration agreement in the customer agreement forms, particularly in light of the conspicuous signature page language affirmatively certifying their receipt of those forms. Moreover, substantial evidence affirmatively indicates that Investors received, were aware of, understood, and knowingly, voluntarily, and intelligently assented to the arbitration agreements and associated waivers of their rights to full legal redress and jury trial. Under the totality of the circumstances, we hold that the District Court correctly concluded that Investors knowingly, voluntarily, and intelligently assented to the subject arbitration agreements and validly waived their associated rights to legal redress and jury trial.

¶24 *2. Did the District Court correctly conclude that the subject arbitration agreements were not unconscionable?*

¶25 The terms of an otherwise validly formed contract are unenforceable under generally applicable contract principles if the terms are either contrary to public policy or unconscionable. *Kortum*, ¶¶ 26-27. Over the years, we have needlessly complicated this analysis by inconsistently defining equitable unconscionability and erroneously interjecting the insurance-specific reasonable expectations doctrine into our generally

18

applicable unconscionability analysis. Since 1986, we have repeatedly held that arbitration agreements in otherwise validly formed contracts of adhesion are unenforceable only if not within the "reasonable expectations" of the weaker party or nevertheless "unduly oppressive, unconscionable, or against public policy." *E.g.*, *Tedesco v. Home Savings Bank Corp.*, 2017 MT 304, ¶ 30, 389 Mont. 468, 407 P.3d 289; *Day,* ¶ *11*; *Kelker*, ¶ 18; *Graziano v. Stock Farm Homeowners Ass'n, Inc.*, 2011 MT 194, ¶ 20; 361 Mont. 332, 258 P.3d 999; *Kortum*, ¶ 23; *Woodruff*, ¶ 13; *Larsen v. Western States Ins.*, 2007 MT 270, ¶ 15, 339 Mont. 407, 170 P.3d 956; *Zigrang v. U.S. Bancorp Piper Jaffray, Inc.*, 2005 MT 282, ¶¶ 13, 18, 329 Mont. 239, 123 P.3d 237; *Kloss*, ¶ 24; *Iwen*, ¶ 27; *Chor*, 261 Mont. at 149, 862 P.2d at 30; *Passage v. Prudential-Bache Securities, Inc.*, 223 Mont. 60, 66, 727 P.2d 1298, 1302 (1986).[11] Unfortunately, this oft-repeated rule is a circular intermix of our traditional two-element equitable unconscionability analysis and the incompatible, insurance-specific reasonable expectations doctrine. Rather than continue to perpetuate this analytical imprecision and error, we briefly digress for analytical clarification.

¶26    As a threshold matter, violation of public policy is an independent, generally applicable ground for invalidating a contract provision, separate and distinct from equitable

---

[11] We have interjected the *Passage* reasonable expectations/unconscionability rule beyond the arbitration agreement context into our assessment of other types of contracts of adhesion. *See*, *e.g.*, *Highway Specialties, Inc. v. Montana Dept. of Transp.*, 2009 MT 253, ¶ 12, 351 Mont. 527, 215 P.3d 667 (liquidated damages provision); *Polzin v. Appleway Equipment Leasing, Inc.*, 2008 MT 300, ¶ 21, 345 Mont. 508, 191 P.3d 476 (choice of law and venue provisions); *Denton v. First Interstate Bank of Commerce*, 2006 MT 193, ¶ 30, 333 Mont. 169, 142 P.3d 797 (bank promissory note contracts); *Arrowhead School Dist.*, ¶¶ 64-68 (liquidated damages provision); *LaFournaise v. Montana Development Ctr.*, 2003 MT 240, ¶ 12, 317 Mont. 230, 77 P.3d 202 (collective bargaining agreement terms).

unconscionability or the reasonable expectations of the weaker party. *See* §§ 28-2-102(3), -602, -603, and -701, MCA (requirement for lawful object as an essential element for contract formation). *See also*, *e.g.*, *State Farm Mut. Auto Ins. v. Gibson*, 2007 MT 153, ¶ 11, 337 Mont. 509, 163 P.3d 387 (holding insurance anti-stacking provision invalid as contrary to public policy).[12] In contrast, in modern contract law, unconscionability is a two-element equitable doctrine rendering an otherwise validly formed contract or term unenforceable[13] if (1) the contract or term is a contract of adhesion and (2) the contract or term unreasonably favors the stronger party or is unduly oppressive to the weaker party. *Junkermeir, Clark, Campanella, Stevens, P.C. v. Alborn, Uithoven, Reikenberg, P.C.*, 2016 MT 218, ¶ 33, 384 Mont. 464, 380 P.3d 747*; Day*, ¶ 8*; Kelker*, ¶ 29*; Fisher ex rel. McCartney v. State Farm Mut. Ins. Co.*, 2013 MT 208, ¶ 41, 371 Mont. 147, 305 P.3d 861; *Summers v. Crestview Apts.*, 2010 MT 164, ¶ 22, 357 Mont. 123, 236 P.3d 586; *American Music Co. v. Higbee*, 2004 MT 349, ¶ 23, 324 Mont. 348, 103 P.3d 518; *Arrowhead School Dist.*, ¶ 48; *Iwen*, ¶ 31; *Leibrand v. National Farmers Union Prop. & Cas. Co.*, 272 Mont. 1, 12-13, 898 P.2d 1220, 1227 (1995). *Accord Estate of Michael v. Glacier Gen. Ins. Co.*, 264 Mont. 261, 266, 871 P.2d 272, 275 (1994) (bargaining power disparity and oppression of weaker party are indicia of unconscionability); *Kelly v. Widner*, 236 Mont. 523, 528, 771 P.2d 142, 145 (1989) ("unequal bargaining power, lack of

---

[12] *But see Restatement (Second) of Contracts* § 208 cmt. a-b (1981) (noting conflated view violation of public policy as a consideration of unconscionability).

[13] "Particular [contract] terms may be unconscionable whether or not the contract as a whole is unconscionable." *Restatement (Second) of Contracts* § 208 cmt. e (1981).

meaningful choice, oppression, and exploitation of the weaker party's vulnerability or lack of sophistication" are indicia of unconscionability); *Restatement (Second) of Contracts* § 208 cmt. a-e (1981). Under the first element, a contract of adhesion is a contract wherein a party in superior bargaining position dictates the contract terms to the weaker party on a take it or leave it basis without any reasonable opportunity for negotiation. *Graziano*, ¶ 18; *Woodruff*, ¶ 8; *Denton v. First Interstate Bank of Commerce*, 2006 MT 193, ¶ 30, 333 Mont. 169, 142 P.3d 797. Preprinted, standard-form consumer contracts are typically contracts of adhesion. *Woodruff*, ¶¶ 8-11.

¶27 However, whether viewed as stemming from the modern Uniform Commercial Code, *see Leibrand*, 272 Mont. at 12-13, 898 P.2d at 1227, or having deeper roots in equity, *see Restatement (Second) of Contracts* § 208 cmt. a-e (1981), we did not consider the reasonable expectations of the weaker party in conjunction with our generally applicable, equitable unconscionability analysis until we rejected a "reasonable expectations" argument as an independent ground for invalidating a standard-form arbitration agreement, which was not unconscionable. *See Passage*, 223 Mont. at 65-66, 727 P.2d at 1301-02. In *Passage*, the plaintiff asserted that, even if not equitably unconscionable, the standard-form arbitration agreement was independently unenforceable by extension of the insurance-specific reasonable expectations doctrine first recognized by this Court in *Transamerica Ins. Co. v. Royle*, 202 Mont. 173, 180-81, 656 P.2d 820, 824 (1983). *Passage*, 223 Mont. at 65-66, 727 P.2d at 1301-02. Without analysis of the threshold compatibility of the insurance-specific doctrine as a generally applicable contract principle outside the narrow insurance context, we first quoted our now-familiar hybrid reasonable

21

expectations/unconscionability rule from a cited federal district court decision and then merely held that:

> There is nothing in the record to indicate that the arbitration clause . . . was not within the parties' reasonable expectations. Nor is there any evidence that the clause is oppressive or unconscionable.

*Passage*, 223 Mont. at 66, 727 P.2d at 1302. Thus was the advent of the unsupported but now-canon consideration of the reasonable expectations doctrine as a generally applicable contract enforcement principle.

¶28 While we have attempted to clarify the "'reasonable expectation' analysis" as a mere "subset of whether a contract is 'unconscionable,'" *Kelker*, ¶¶ 18-19 (recharacterizing reasonable expectations of weaker party as an included consideration when determining whether terms of a contract of adhesion unreasonably favor stronger party rather than as an independent defect), we have continued to perpetuate confusion by inaccurately referencing unconscionability, unduly oppressive terms, and terms beyond the reasonable expectations of the weaker party as distinct grounds for determining that a contract of adhesion is unenforceable. *See, e.g., Tedesco*, ¶ 32; *Day*, ¶ 11; *Kelker*, ¶ 18. Even more problematic in particular regard to arbitration agreements, we have failed to recognize the manifest incompatibility of the insurance-specific reasonable expectations doctrine as a generally applicable contract principle.

¶29 Contrary to our attempt to merge the reasonable expectations doctrine with equitable unconscionability, they are two wholly separate and distinct legal concepts. *See Fisher*, ¶¶ 41-44 (separately analyzing whether standard-form insurance contract provision violated public policy, was within reasonable expectations of the weaker party, or was

unconscionable). As first recognized in *Transamerica Ins. Co.*, 202 Mont. at 181-82, 656 P.2d at 824, the "reasonable expectations doctrine" mandates that, unless the terms of an insurance policy "clearly demonstrate an intent to exclude coverage," an insurance buyer's "objectively reasonable expectations" regarding the nature of the policy "should be honored notwithstanding the fact that a painstaking study of the policy would have negated those expectations." *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 42, 354 Mont. 15, 221 P.3d 666 (internal punctuation omitted). The reasonable expectations doctrine is a special, public policy-based rule requiring liberal construction of insurance policies in favor of coverage when the policy language is such that "an ordinary, objectively reasonable person . . . would fail to understand" that the policy technically does not provide the coverage at issue or where "circumstances attributable to" the insurer would cause an "an ordinary, objectively reasonable person" to believe that the coverage exists. *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1048-49 (Colo. 2011). *Accord Winter v. State Farm Mut. Auto Ins. Co.*, 2014 MT 168, ¶ 19, 375 Mont. 351, 328 P.3d 665; *Fisher*, ¶¶ 19-21 (citing *Bailey*, 255 P.3d at 1050); *American Family Mut. Ins. Co. v. Livengood*, 1998 MT 329, ¶ 32, 292 Mont. 244, 970 P.2d 1054; *Wellcome v. Home Ins. Co.*, 257 Mont. 354, 358, 849 P.2d 190, 193-94 (1993). The reasonable expectations doctrine is a special, insurance-specific rule that supplements generally applicable contract principles in the insurance context. *Bailey*, 255 P.3d at 1050. In contrast to the special public policy justification for the reasonable expectations doctrine, no similar or analogous public policy mandates narrow enforcement of arbitration agreements. To the contrary, subject only to generally applicable contract principles, Congress has set a paramount public policy strongly

favoring arbitration agreements in interstate commerce. *Perry*, 482 U.S. at 489, 107 S. Ct. at 2525 (citing *Moses H. Cone Memorial Hosp.*, 460 U.S. at 14, 103 S. Ct. at 941). The FAA preempts and precludes any special public policy-based limitation or restriction of arbitration agreements. *Iwen*, ¶ 24; *Concepcion*, 563 U.S. at 339, 131 S. Ct. at 1746; *Casarotto*, 517 U.S. at 686-87, 116 S. Ct. at 1656. Expansion of the reasonable expectations doctrine to be similarly applicable to arbitration agreements, and thus a special public policy based justification for narrowly construing the clear and unambiguous language of an arbitration agreement based on the unwritten expectations of the non-drafting party, would contravene and be preempted by the FAA. *Mortensen v. Bresnan Communications LLC*, 722 F.3d 1151, 1161 (9th Cir. 2013).[14] Such expansion of the doctrine from a special public policy based rule, narrowly applicable in the insurance context, to a generally applicable contract principle would similarly contravene the parol evidence rule, thereby destroying the stability and predictability of written contracts. *See*

---

[14] The Ninth Circuit held that, as "currently employed," the Montana "reasonable expectations/fundamental rights rule runs contrary to the FAA as interpreted by *Concepcion* because it disproportionally applies to arbitration agreements, invalidating them at a higher rate than other contract provisions." *Mortensen*, 722 F.3d at 1161 (citing *Kortum*, ¶¶ 20-28). However, *Mortenson* is based on an erroneous characterization of our requirement for a knowing, voluntary, and intelligent waiver to include a requirement that arbitration agreements be specifically "explained to and initialed by consumers" in every case. *Mortensen*, 722 F.3d at 1160. Closer scrutiny of our pertinent holdings reveals that we have never required special explanation and initialing of arbitration agreement provisions as a requirement for a valid constitutional waiver or avoidance of unconscionability in every case. Rather, we have merely found that those considerations *may* be relevant, *inter alia*, to whether a valid constitutional waiver occurred, and whether adhesive contract terms were unconscionable as a matter of equity, under the totality of the circumstances in a particular case. *Woodruff*, ¶ 15; *Kortum*, ¶¶ 25-27; *Kloss*, ¶¶ 27-28; *Chor*, 261 Mont. at 149-53, 862 P.2d at 30-32. Thus, by weeding-out the reasonable expectations doctrine and clarifying our generally applicable constitutional waiver and equitable unconscionability analyses, we distinguish the dark cloud of *Mortenson*.

24

§§ 28-2-905(1) and 28-3-303, MCA (resort to extrinsic evidence to construe clear and unambiguous contract language prohibited—intent of parties to written contract must "be ascertained from the writing alone if possible"). Thus, the reasonable expectations doctrine is incompatible as a generally applicable contract principle, particularly in regard to FAA-governed arbitration agreements.

¶30 However, without reference to the reasonable expectations of the weaker party and to the extent not arbitration-specific, the non-exclusive *Kortum* factors remain relevant considerations, *inter alia*, to whether a valid waiver of applicable Montana constitutional rights has occurred and whether the terms of a contract of adhesion are equitably unconscionable under the totality of the circumstances in a particular case. *Day*, ¶ 11; *Kelker*, ¶¶ 20-24 (citing *Highway Specialties*, ¶ 16, and 7 Arthur Linton Corbin, *Corbin on Contracts*, § 29.4 (Joseph M. Perillo ed., rev. 2017)); *Kortum*, ¶¶ 26-27. Thus, clarifying our oft-stated rule from *Passage* and its progeny: (1) the reasonable expectations doctrine is not a generally applicable contract principle; (2) whether the terms of a contract of adhesion are unduly oppressive to the weaker party is a relevant consideration of equitable unconscionability rather than a separate concept; and (3) the *Kortum* factors remain relevant to whether a valid waiver of applicable Montana constitutional rights has occurred and whether a contract or term of adhesion is unconscionable.

¶31 Applied here, the standard-form FSC arbitration agreements were unquestionably contracts of adhesion. Whether a contract term of adhesion unreasonably favors the stronger party or is unduly oppressive to the weaker party, is a mixed question of fact and law under the totality of circumstances surrounding the execution of the contract. In

addition to the non-exclusive *Kortum* factors, other relevant considerations may include, *inter alia*, whether the disputed term was common in prior dealings between the parties, whether the weaker party carefully reviewed the agreement, and whether the stronger party personally explained the nature and consequences of the disputed term. *Woodruff*, ¶ 15; *Kloss*, ¶ 28. However, absent a fiduciary relationship or other special relationship of trust and reliance, securities brokers and advisors have no duty to further explain the legal consequences of a clear, explicit, and conspicuous arbitration agreement. *Chor*, 261 Mont. at 149-53, 862 P.2d at 30-32. Absent special circumstances, such as the broker's exercise of discretionary authority "to buy and sell in a customer's account," the relationship between a securities broker/advisor and client is not a fiduciary or other special relationship of trust and reliance. *Chor*, 261 Mont. at 152-53, 862 P.2d at 32.

¶32 As in our foregoing analysis of the sufficiency of Investors' waiver of their Montana constitutional rights, the *Kortum* factors similarly indicate that the FSC arbitration agreements were not unreasonably favorable to FSC/RMF or unduly oppressive to Investors. As manifest in this case, standard-form arbitration agreements are common, if not pervasive, in securities brokerage contracts. *See, e.g.*, *Passage*, 223 Mont. at 65-66, 727 P.2d at 1301-02. Investors were all highly intelligent, educated, sophisticated, and experienced market investors with extraordinary business acumen. There is substantial credible evidence that at least two of the four Investors had previously arbitrated a securities brokerage dispute with RMF under similar agreements. There is no evidence that the Investors carefully studied the FSC customer agreement form before signing or that the procuring RMF representatives personally explained the nature and consequences

26

of the arbitration agreements. However, unlike in *Kloss*, there is substantial evidence that no fiduciary or other special relationship of trust and reliance existed between Investors and FSC/RMF. Also, unlike in *Kloss*, there is no evidence that Investors were anything other than highly sophisticated and experienced market investors, well aware and accustomed to the terms and consequences of the standard-form FSC arbitration agreements.

¶33 Finally, there is substantial, uncontradicted evidence that the FSC brokerage agreement forms were subject to regulatory oversight and approval by the federal SEC and FINRA. There is no evidence or allegation that they did not comply with applicable SEC regulations. "Agreements to arbitrate disputes in accordance with SEC-approved procedures are not unconscionable as a matter of law." *Chor*, 261 Mont. at 149, 862 P.2d at 30 (citing *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 286 (9th Cir. 1988)). Under the totality of the circumstances, we hold that the District Court correctly concluded that the standard-form FSC arbitration agreements were not unconscionable.

## CONCLUSION

¶34 We hold that the District Court's findings of fact are supported by substantial evidence and not clearly erroneous. We hold that the District Court correctly concluded that Investors knowingly, voluntarily, and intelligently assented to the terms of the standard-form arbitration agreements and validly waived their associated Montana constitutional rights to full legal redress and jury trial. We hold further that the District Court correctly concluded that the standard-form FSC arbitration agreements were not unconscionable. Therefore, we hold that the District Court correctly compelled Investors

to submit their claims against FSC and RMF to arbitration pursuant to the subject arbitration agreements.

¶35 Affirmed.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER